# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 12, 2011          Decided August 3, 2011

No. 10-5144

DEFENDERS OF WILDLIFE, ET AL.,
APPELLANTS

v.

KENNETH LEE SALAZAR, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE INTERIOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00945)

*Timothy J. Preso* argued the cause for appellants. With him on the briefs were *Douglas L. Honnold* and *Sean M. Helle*. *Sierra B. Weaver* entered an appearance.

*Mark R. Haag*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief was *Robert H. Oakley*, Attorney.

*James Kaste*, Senior Assistant Attorney General, Office of the Attorney General for the State of Wyoming, was on the brief for intervenor State of Wyoming in support of federal

appellees. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: As required by the National Wildlife Refuge System Improvement Act, the U.S. Fish and Wildlife Service and the National Park Service devised a plan to manage the elk and bison populations in the National Elk Refuge and Grand Teton National Park. Part of this plan includes ending the longstanding agency practice of feeding these animals during the winter. The Defenders of Wildlife challenge the plan because it fails to include a time certain for ending the practice. The district court rejected the challenge, and, for the reasons set forth below, we affirm its judgment.

I

The National Wildlife Refuge System includes over 550 refuges and 150 million acres of protected land. The Department of the Interior, acting through the U.S. Fish and Wildlife Service, manages these properties pursuant to the National Wildlife Refuge Administration Act, Pub. L. No. 89-669, 80 Stat. 926 (1966), as amended by the National Wildlife Refuge System Improvement Act ("Improvement Act"), Pub L. No. 105-57, 111 Stat. 1252 (1997) (codified at 16 U.S.C. §§ 668dd-668ee).

The National Elk Refuge is part of that system. Located just north of Jackson, Wyoming, and adjacent to Grand Teton National Park, the Refuge was established in 1912 when Congress designated 2000 acres in Jackson Hole as a "winter game (elk) reserve." Act of Aug. 10, 1912, Pub. L. No. 62-261, 37 Stat. 293 (codified as amended at 16 U.S.C. § 673). The Refuge is now a 24,700-acre expanse that the Secretary

holds "for the grazing of, and as a refuge for, American elk and other big game animals." 16 U.S.C. § 673a. Its landscape consists of meadows, marshes, streams, ponds, and open fields across a valley floor that includes sagebrush and rock outcroppings, all set against the majestic backdrop of the Teton and Gros Ventre mountain ranges. Lucky wayfarers may spot wolves, grizzly bears, trumpeter swans, and any number of the area's magnificent ungulates, including bison, bighorn sheep, pronghorn, mule deer, and, of course, elk. The National Elk Refuge's eponymous herd comprises one of the largest concentrations of elk in North America. It goes without saying that these elk are of considerable ecological, economic, and cultural value.

Around the turn of the last century, a series of severe winters in Wyoming strained the elk populations and spurred the good people of Jackson to save the elk by feeding them. When Congress created the Refuge in 1912, the federal government continued this practice, which the parties refer to as supplemental feeding. For roughly seventy days each winter, approximately 7000 elk and 1000 bison are drawn daily to the federal trough.

In recent years, it has become apparent that this practice, though born of benevolence, causes significant problems. According to the Department of the Interior, supplemental feeding leads to a seasonal concentration of elk and bison that is "an unnatural situation that has contributed to . . . an increased risk of potentially major outbreaks of exotic diseases . . . [and] damage to and loss of habitat." Final Bison and Elk Management Plan and Environmental Impact Statement for the National Elk Refuge / Grand Teton National Park / John D. Rockefeller, Jr., Memorial Parkway 9 (Feb. 1, 2007) [hereinafter February 2007 Management Plan and EIS]. This risk poses an existential threat to the elk and bison and puts the very purpose of the Refuge at jeopardy. *See id.*

(noting that the risk of diseases posed by increased concentrations of the animals has "the greatest potential to hinder . . . [the] purposes . . . [of] the National Elk Refuge").

One major problem is brucellosis—also known as "Bangs disease, undulant fever, and contagious abortion," *id.* at 564—which causes an infected female to abort her first calf, leaving behind contaminated fetal tissue on the ground capable of transmitting the disease to other animals, *id.* at 129. Brucellosis rates within normal Wyoming elk herds are approximately two percent, but rates among elk that frequent the Refuge feeding lines have averaged around seventeen percent in recent years. *Id.* at 130. Another major problem, chronic wasting disease (CWD), is the elk version of mad cow disease: Like its bovine counterpart, CWD assaults the central nervous system, causing brain lesions, behavioral changes, a loss of body condition, and ultimately death. CWD is caused by abnormal, non-living proteins known as prions that persist in the soil where infected animals graze, even after intensive efforts to remove them. *Id.* at 136-40. Statistical sampling suggests that in open, elk-hunt areas in Wyoming, the prevalence of CWD in elk averages around four percent. *Id.* at 137. But in confined areas—like those created by the feed lines—the prevalence can exceed ninety percent. *Id.* CWD is not yet prevalent in the Refuge, but if that changes, "environmental contamination will become a major concern due to the disease's ability to persist in the environment for a long period of time." *Id.*

All agree that supplemental feeding increases the risk of such diseases. Without supplemental feeding, the elk would gather in smaller groups, meaning that one sick elk would infect only the handful of others around it. But because the feeding lines bring so many together, the disease of one can quickly become that of many, if not all.

Spurred by a district court order requiring reassessment of the winter feeding operation, *see Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 12-15 (D.D.C. 1998), the Fish and Wildlife Service teamed with the National Park Service,[*] also part of the Department of the Interior, to prepare a management plan for the elk and bison populations. The agencies analyzed six alternatives for managing the herds over the next fifteen years. These plans ran the gamut from maintaining the status quo to ending the practice of supplemental feeding within five years.

In April 2007, the agencies settled on an approach that would, over time, create conditions that would allow the elk and bison to survive the winter without supplemental feeding and, in the meantime, manage the risk of contagion until the practice ended. In essence, their plan seeks to restore natural forage that will allow the animals to sustain themselves during wintertime without the help of supplemental feeding. Bison and Elk Management Plan: National Elk Refuge and Grand Teton National Park 129-34 (Apr. 2007) [hereinafter April 2007 Management Plan]. For example, it provides for substantial reductions in the numbers of elk and bison, primarily through short-term increases in hunting, so that their populations will be closer to levels that would have existed had there never been a practice of supplemental feeding. *Id.* at 134-37. The plan also seeks to reduce disease transmission by rotating feed sites, spreading feed in long lines, separating elk and bison from neighboring livestock, providing increased CWD monitoring, and allowing Wyoming to vaccinate the herds. *Id.* at 138-39. Ultimately, over a fifteen-year period, "[a]s habitat and population objectives are achieved, [the agencies will aim to] decrease reliance on intensive

---

[*] Because the plan in this case also addresses management of elk and bison populations in nearby Grand Teton National Park, the National Park Service, which manages the park, joined in the effort.

supplemental winter feeding, including complete transition to free-standing forage if and when several established criteria are met, including support from the Wyoming Game and Fish Department and the public." *Id.* at 137.

Before adopting this approach, the agencies considered and rejected the petitioners' preferred alternative, which would have committed the Secretary to ending supplemental feeding within five years. As described in their brief, the agencies recognized that this alternative "would provide some advantages in terms of habitat benefits, a lower prevalence of brucellosis over the long term, and a lower risk for the spread of chronic wasting disease." Appellees' Br. 19 (citing Record of Decision, Final Bison and Elk Management Plan and Environmental Impact Statement: National Elk Refuge and Grand Teton National Park 10 (Apr. 2007) [hereinafter Record of Decision]). But they also found that "[this alternative] would likely result in an increase in elk mortality from starvation, predation, and disease related to poor body condition, particularly in severe winters." *Id.* (citing Record of Decision 10). This in turn would lead to a "long-term decrease in elk hunting and viewing opportunities in the Refuge, with attendant impacts on the area economy, and could cause elk herd numbers to fall below [the Wyoming Game and Fish Department's] statewide objective in some years." *Id.* at 19-20 (citing Record of Decision 10).

The agencies concluded that their preferred plan "[is more] consistent with regional herd management objectives, better balances divergent stakeholder interests, builds upon success on the ground, and enables managers to adapt to new information and changing conditions," all while preparing the animals for the eventual cessation of supplemental feeding and providing most of the benefits offered by the petitioners' preferred alternative. *Id.* at 20 (citing Record of Decision 14). On the issue of when to end supplemental feeding, the

agencies stressed that although they are committed to abandoning the practice, they would "not preclude the use of supplemental feeding or other management tools as [they] work to resolve the bison and elk management issues . . . . [N]or [would they] make predictions about how fast [they could] implement the phased approach for improving forage, reducing the [elk and bison populations], and reducing the need for supplemental feed . . . . When the biological, social, and political conditions enable [them] to consider a phase-out of feeding, [the plan's] adaptive framework provides [the agencies] with that flexibility." Record of Decision 13. In essence, the agencies determined that a deadline for ceasing supplemental feeding would be unduly restrictive in light of the many variables and concerns that need to be accounted for in managing the Refuge.

The Defenders of Wildlife, the Jackson Hole Conservation Alliance, the National Wildlife Refuge Association, the Greater Yellowstone Coalition, and the Wyoming Outdoor Council (collectively, the Defenders) filed suit in the district court, challenging the Secretary's plan under the Administrative Procedure Act. They argue the plan's failure to commit to a deadline for ending supplemental feeding was arbitrary and capricious given the Secretary's duty under the Improvement Act to "provide for the conservation of . . . wildlife" and "ensure that the biological integrity, diversity, and environmental health of the [wildlife refuge system] are maintained." 16 U.S.C. § 668dd(a)(4)(A)-(B). The district court granted summary judgment for the agencies, reasoning that the plan accounted for and managed the dangers of supplemental feeding and also created a program for phasing out the practice over a fifteen-year period. *Defenders of Wildlife v. Salazar*, 698 F. Supp. 2d 141, 147-48 (D.D.C. 2010). The Defenders of Wildlife filed a timely appeal, and we take jurisdiction pursuant to 28 U.S.C. § 1291.

We review the district court's grant of summary judgment de novo. *Castlewood Prods., LLC v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004). Under the Administrative Procedure Act, we set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our review focuses on whether the agency examined the relevant data, articulated a satisfactory explanation for its action, based its decision on the relevant factors, and committed no clear error of judgment. *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004).

II

The parties agree that supplemental feeding poses serious risks for the elk and bison in the Refuge. The only question this case presents is whether it was arbitrary and capricious for the Secretary to transition away from supplemental feeding without committing himself to ending the practice on a particular date.

The Defenders argue it was, inasmuch as the very purpose of the National Wildlife Refuge System, as set out in the Improvement Act, "is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2). To that end, the Defenders point out, the Act mandates that the Secretary manage refuges to "provide for the *conservation* of fish, wildlife, and plants, and their habitats within the System" and to "ensure that the *biological integrity, diversity, and environmental health* of the System are maintained for the benefit of present and future generations of Americans." *Id.* § 668dd(a)(4)(A), (B) (emphases added). The Act also instructs the Secretary to

"sustain and, where appropriate, restore and enhance, healthy populations of fish, wildlife, and plants utilizing . . . methods and procedures associated with modern scientific resource programs." *Id.* § 668ee(4). The Defenders argue that the Secretary's plan is unlawful because it does not fix a definite time for ending supplemental feeding, even though the agencies have acknowledged that the dangers posed by this practice imperil explicit statutory objectives. *See* February 2007 Management Plan and EIS 9. Underlying this statutory argument is some common sense: the whole point of a National Elk *Refuge* is to provide a sanctuary in which populations of healthy, reproducing elk can be sustained. *See* 16 U.S.C. § 673a (creating a "refuge" for the elk). The Refuge can hardly provide such a sanctuary if, every winter, elk and bison are drawn by the siren song of human-provided food to what becomes, through the act of gathering, a miasmic zone of life-threatening diseases.

The Defenders acknowledge that the Improvement Act also requires the Secretary to consider other factors such as the importance of recreation on refuge lands and cooperation with state officials in pursuing the objectives of the Act. *See id.* § 668dd(4)(I), (M). They argue, however, that such considerations may be pursued only when "compatible" or "consistent with" the conservation mission of the System and the purposes of each refuge. *See id.* § 668dd(a)(3)(B), (e)(3). Reading the several provisions of the Act that emphasize the importance of wildlife conservation together with the general purpose of the National Wildlife Refuge System, the Defenders contend that the agencies' top priority in managing the Refuge must be conservation, and other considerations must not hinder that objective.

For their part, the Secretary and Wyoming (intervening as a defendant-appellee in this case) argue that the Improvement Act confers upon the Secretary broad managerial discretion in

how to pursue the Act's objectives. They concede that conservation is the overarching objective, but argue that it cannot be the sole consideration. After all, the Act lists fourteen factors that the Secretary "shall" consider in administering the System, including, among others, "ensur[ing] effective coordination, interaction, and cooperation" with adjoining landowners and State fish and wildlife agencies in pursuit of the objectives of the Act. *Id.* § 668dd(a)(4)(E).

Given the discretion afforded him, the Secretary argues that the agencies reasonably determined that the plan is consistent with the objectives of the Act and the purposes of the Refuge. The plan addresses the risk of diseases by (1) increasing natural forage and decreasing the herd sizes, which will work in tandem to create conditions under which supplemental feeding can be stopped without unduly increasing the risk of starvation, (2) monitoring and managing the diseases that accompany gathering at the feed lines, and (3) progressively reducing reliance on supplemental feeding when certain criteria have been met.

There is no doubt that unmitigated continuation of supplemental feeding would undermine the conservation purpose of the National Wildlife Refuge System. But we cannot conclude that the agencies acted unlawfully by adopting a plan that contained no deadline for ending the practice, and that is the only issue before us. The record amply demonstrates that the agencies collected the relevant data, identified the dangers posed by supplemental feeding, and adopted a plan to mitigate those dangers. That they also determined that the many objectives of the Act, including conservation, could best be met without implementation of a fixed deadline for stopping supplemental feeding was not arbitrary or capricious.

The district court was right that the plan "might well have been unreasonable had the agencies categorically refused to phase out the winter feeding program in spite of all the evidence in the record about the dangers of supplemental feeding." *Defenders of Wildlife*, 698 F. Supp. 2d at 148. But they did no such thing. Instead, they selected an approach that is geared toward ending the practice over time while maintaining the flexibility needed to respond to facts on the ground. The Defenders are understandably concerned that this flexibility could be used to continue the practice indefinitely. But the agencies must proceed in a manner that is consistent with the science and accounts for the risks posed by supplemental feeding. There is nothing the agencies have said or done that causes us to doubt that they will. It is highly significant and indeed dispositive to us, as it was to the district court, that the agencies are committed to ending supplemental feeding. We do not know precisely how they will proceed, and that makes it impossible, at this stage, to declare that their plan is arbitrary and capricious simply because it does not specify a particular date by which the practice will cease. Should the agencies act unreasonably in establishing criteria for the transition or in otherwise carrying out the plan, that will be a different issue for another panel.

III

The Defenders also argue that the plan unlawfully gives the Wyoming Fish and Game Department a veto over whether supplemental feeding will end. They point to language in the plan stating that the agencies will seek to "decrease reliance on intensive supplemental winter feeding, including complete transition to free-standing forage *if and when several established criteria are met, including support from the Wyoming Game and Fish Department* and the public." April 2007 Management Plan 137 (emphasis added).

Regardless of how we might have read this language in the first instance, the Secretary has assured us in his briefs and at oral argument that the language confers no veto. *See* Appellees' Br. 34 (characterizing the disputed provision as "aspirational" rather than a grant of any power to Wyoming); Wyoming's Br. 28 n.6 (also agreeing that Wyoming does not have a veto); *cf. Wyoming v. United States*, 279 F.3d 1214, 1234 (10th Cir. 2002) ("[F]ederal management and regulation of federal wildlife refuges preempts state management and regulation of such refuges . . . where state management and regulation stand as an obstacle to the accomplishment of the full purposes and objectives of the Federal Government."). We take the Secretary at his word that Wyoming has no veto over the Secretary's duty to end a practice that is concededly at odds with the long-term health of the elk and bison in the Refuge.

## IV

For the foregoing reasons, the district court's judgment is

*Affirmed.*