# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 11, 2017     Decided November 7, 2017

No. 16-5282

TIMOTHY MAYO,
APPELLEE

KENT NELSON,
APPELLANT

v.

MICHAEL T. REYNOLDS, IN HIS OFFICIAL CAPACITY AS ACTING
DIRECTOR OF THE U.S. NATIONAL PARK SERVICE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01751)

———

*Eric R. Glitzenstein* argued the cause for appellant. With him on the briefs was *Katherine A. Meyer*.

*Rachel Heron*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With her on the brief were *Jeffrey H. Wood*, Acting Assistant Attorney General, and *Andrew Mergen*, *J. David Gunter II*, and *Judith Coleman*, Attorneys.

*Erik E. Petersen*, Assistant Attorney General, Office of the Attorney General for the State of Wyoming, argued the cause for intervenor-appellee State of Wyoming. With him on the brief was *James Kaste*, Senior Assistant Attorney General.

*Douglas S. Burdin*, *Anna M. Seidman*, and *Jeremy E. Clare* were on the brief for intervenor-appellee Safari Club International.

Before: MILLETT, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This case involves a challenge to decisions made by the National Park Service ("Park Service") authorizing recreational hunting of elk in Wyoming's Grand Teton National Park ("Grand Teton"). Appellant claims that the Park Service violated the National Environmental Policy Act ("NEPA") by authorizing recreational hunts each year without first conducting a NEPA review to assess whether and to what extent hunting was in fact necessary for the proper management and protection of the elk. Appellant's Br. 26.

Grand Teton and the National Elk Refuge ("Refuge") are home to the "Jackson herd," one of the largest concentrations of elk in North America. Two federal agencies share primary responsibility for managing the Jackson herd: the Park Service, which has jurisdiction over Grand Teton, and the U.S. Fish and Wildlife Service ("FWS"), which manages the Refuge. In 2007, the two agencies, acting together, adopted a fifteen-year plan ("2007 Plan") to manage the Jackson herd. The 2007 Plan set objectives to reduce the population size of

the herd, limit their risk of disease, and conserve their habitat. In conjunction with the 2007 Plan, the agencies also issued a final environmental impact statement ("EIS"), as required by NEPA.

The 2007 Plan analyzed six alternative long-term strategies for managing the Jackson herd. The EIS, in turn, carefully assessed the environmental risks posed by the alternative strategies. In the end, the agencies adopted an elk-reduction program pursuant to which the Park Service would authorize elk hunting as needed to attain the Plan's population objectives. The program also contemplated that the FWS would reduce supplemental feed given to the elk during winter months on the Refuge. Between 2007 and 2015, the Park Service adhered to the elk-reduction program in determining the number of elk authorized to be harvested and the number of hunters deputized to participate in a hunt. As a result, from 2007 to 2015, the size of the herd decreased, as did the number of deputized hunters and the number of elk authorized to be harvested. During this same period, however, the FWS failed to meet the 2007 Plan's objective to wean the herd from supplemental feed.

Kent Nelson and Timothy Mayo, wildlife photographers, filed suit in the District Court challenging the Park Service's 2015 program for elk hunting. *See Mayo v. Jarvis*, 177 F. Supp. 3d 91, 107–24 (D.D.C. 2016). They argued that the Park Service was required to prepare a new NEPA analysis every year that it implemented the fifteen-year elk-reduction program, disclosing and analyzing the unique environmental effects of each year's hunt. Because no such analysis was done for the 2015 hunt authorization, they claimed that the Park Service's action violated NEPA. Appellants also contended that the FWS's failure to reduce supplemental feeding in line with the Plan's goals necessitated the

preparation of a supplemental EIS. However, supplemental feeding is managed by the FWS and Nelson and Mayo did not seek to pursue any action against the FWS with respect to that program. With respect to the NEPA claims, the District Court denied the plaintiffs' summary judgment motion and granted the Park Service's cross-motion for summary judgment. *Id.* at 146. Nelson, but not Mayo, now appeals the District Court's judgments.

In its brief to this court, the Park Service cogently explains why the judgment of the District Court should be affirmed:

> Under NEPA, an agency must take a hard look at the environmental impacts of its proposed actions. The statute does not, however, require the agency to take a *new* look every time it takes a step that implements a previously-studied action, so long as the impacts of that step were contemplated and analyzed by the earlier analysis. Here, the Park Service's 2007 Management Plan contemplated that the Park Service would authorize annual elk-reduction programs, and the 2007 EIS accompanying that plan specifically analyzed the effects of such programs. . . . [Appellant] has not identified any impact from the 2015 reduction program that was not studied in the 2007 EIS . . . . The Park Service has therefore satisfied NEPA.

Appellees' Br. 24. We agree. We therefore affirm the District Court's judgment on the NEPA issues.

In the District Court, the plaintiffs also claimed that the agencies' consultation over the effects of the elk-reduction program on the grizzly bear population did not satisfy the requirements of the Endangered Species Act ("ESA"). All

parties agree that this claim is now moot because the grizzly bear is no longer listed as a threatened species under the ESA. *See* Endangered Species and Threatened Wildlife and Plants, 82 Fed. Reg. 30,502 (June 30, 2017) (to be codified at 50 C.F.R. pt. 17). We therefore vacate the District Court's judgment on the ESA claim. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39–40 (1950).

## I.  BACKGROUND

## A.  Statutory and Regulatory Background

### 1.  *National Environmental Policy Act*

Congress enacted the National Environmental Policy Act ("NEPA") in part "to promote efforts which will prevent or eliminate damage to the environment and biosphere and . . . enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321 (2012). To those ends, NEPA requires all federal agencies to include a detailed environmental impact statement ("EIS") "in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment." *Id.* § 4332(2)(C). This process ensures that an agency will "consider every significant aspect of the environmental impact of a proposed action" and "inform the public" of its analysis. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004). "In other words, agencies must 'take a hard look at [the] environmental consequences' of their actions, and 'provide for broad dissemination of relevant environmental information.'" *Pub. Emps. for Envtl. Responsibility v. Hopper*, 827 F.3d 1077, 1082 (D.C. Cir. 2016) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)) (internal quotation marks omitted).

Not every agency action requires the preparation of a full EIS, however. *See, e.g.*, *Duncan's Point Lot Owners Ass'n Inc. v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008) ("[F]ederal control and responsibility for an action is not enough to trigger the EIS requirement."). Thus, in determining whether a major federal action "significantly affect[s]" the environment, 42 U.S.C. § 4332(2)(C), an agency may prepare a more concise environmental assessment ("EA"), *see* Council on Environmental Quality ("CEQ") regulations, 40 C.F.R. § 1508.9, which may result in the agency issuing a "finding of no significant impact" in lieu of a full EIS, *see id.* § 1508.13.

Where NEPA analysis is required, its role is "primarily information-forcing." *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017). As the Supreme Court has explained, "[t]here is a fundamental distinction . . . between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." *Robertson*, 490 U.S. at 352. "NEPA is 'not a suitable vehicle' for airing grievances about the substantive policies adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'" *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (quoting *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 886 (D.C. Cir. 1987)).

It is now well-established that "NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Pub. Citizen*, 541 U.S. at 756–57; *see also Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,* 435 U.S. 519,

558 (1978) (NEPA's mandate "is essentially procedural"). It is equally clear that NEPA does *not* impose a duty on agencies "to include in every EIS a detailed explanation of specific measures which will be employed to mitigate the adverse impacts of a proposed action." *Robertson*, 490 U.S. at 353 (emphasis omitted) (internal quotation omitted).

An agency is required to supplement an existing EIS only if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns," or if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." CEQ regulations, 40 C.F.R. § 1502.9(c). Under this standard, an agency is not required to make a new assessment under NEPA every time it takes a step that implements a previously studied action, so long as the impacts of that step were contemplated and analyzed by the earlier analysis. *See, e.g.*, *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1257–58 (10th Cir. 2011).

In *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989), the Supreme Court explained that under the "rule of reason," "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *Id.* at 373. Rather, "a supplemental EIS must be prepared" only when a new action will affect the quality of the environment "in a significant manner or to a significant extent not already considered." *Id.* at 374; *see also Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (explaining that a supplemental impact statement is "only required where new information provides a *seriously* different picture of the environmental landscape" (quoting *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 274 (D.C. Cir. 2002))); *Davis v. Latschar*, 202 F.3d 359, 369 (D.C. Cir. 2000) (requiring a supplemental impact

statement only for "changes that cause effects which are significantly different from those already studied"). And because an agency's decision whether to prepare a supplemental EIS requires "substantial agency expertise," courts must defer to the agency's "informed discretion." *Marsh*, 490 U.S. at 366–77.

2. *The 2007 Elk-Management Plan and Environmental Impact Statement*

As noted above, the Park Service and Fish and Wildlife Service jointly manage the Jackson elk herd. In the spring and summer, the Jackson herd tends to reside primarily in Wyoming's Grand Teton National Park, under the jurisdiction of the Park Service. In the winter, however, much of the herd migrates to the neighboring National Elk Refuge, which is managed by the FWS.

Since 1955, the Park Service has annually authorized the hunting of elk in the Park. Although hunting is frequently prohibited in national parks, Congress authorized the practice in Grand Teton in 1950 when it established the Park in its current form. *See* Pub. L. 81-787 § 6(a), 64 Stat. 849, 851–52 (1950), *codified at* 16 U.S.C. § 673c. Specifically, Congress required the Park Service and Wyoming Game and Fish Commission to "devise . . . a program to insure the permanent conservation of the elk within the Grand Teton National Park" and directed that such conservation program "shall include the controlled reduction of elk in such park, . . . when it is found necessary for the purpose of proper management and protection of the elk." 16 U.S.C. § 673c(a).

Part of the Park Service's justification for the elk-hunting program has to do with the practices of the FWS on the Refuge. The FWS provides supplemental feed to elk on the

Refuge during winter months on the assumption that there is an insufficient amount of winter range to support the numbers of elk that occupy the Jackson Hole area. This practice reduces incidents of elk starvation, but it also creates "significant problems" of its own. *Defs. of Wildlife v. Salazar*, 651 F.3d 112, 113 (D.C. Cir. 2011). Supplemental feeding artificially increases the size and density of the elk herd, and it has also contributed to the spread of disease among the elk and erosion of their habitat. *Id.* at 113–14. Authorized hunting offsets some of the adverse effects of supplemental feeding by containing the herd's population size, while also managing the gender and age distributions of the Jackson elk herd.

In 2007, the Park Service and the FWS adopted a fifteen-year plan for managing the Jackson elk herd and prepared an EIS to assess the environmental effects of the plan. *See* Final Bison and Elk Management Plan and Environmental Impact Statement for the National Elk Refuge/Grand Teton National Park/John D. Rockefeller, Jr., Memorial Parkway (Feb. 1, 2007) ("2007 Plan and EIS"), *available at* http://bisonandelkplan.fws.gov. The Plan listed four goals for managing the elk: (1) conserving their habitat, (2) making the population sustainable, (3) contributing to Wyoming's population objectives for the elk, and (4) managing the risk of disease. *Id.* at ix. To achieve those ends, the agencies analyzed six alternative management programs, each of which varied in terms of its goals for the elk reduction level sought, the number of elk wintering on the Refuge, the use of hunting to control the population, and the extent to which supplemental feeding would continue on the Refuge. *See id.* at ix–x.

The agencies chose a program denominated Alternative Four. That option called for reducing the total number of elk in the Jackson herd from approximately 13,000 to 11,000, and

the number of elk wintering on the Refuge, where supplemental feed is served, from 6,800 down to 5,000. *Id.* at 48. The Plan aimed to meet these targets through an "adaptive management approach" involving public education, habitat conservation, and a decreasing use of supplemental feeding "based on established criteria and changing social, political, or biological conditions." *Id.* at 48, 65. In addition, the agencies assumed that hunting would be authorized "on the refuge, and when necessary . . . in the park, to assist the state in managing herd sizes, sex and age ratios, and summer distributions" of elk. *Id.* at 48. Specifically, the 2007 Plan predicted that in Grand Teton over the "long term an estimated average of 232–287 elk per year would be harvested by 773–957 deputized hunters, compared to baseline figures of 1,600 hunters and 480 elk per year." *Id.* at 472.

As noted above, the Park Service and the FWS also prepared an environmental impact statement in conjunction with the 2007 Plan, as required by NEPA. The final EIS carefully addressed the impact of the Plan's six alternatives – including the preferred elk-reduction program – on, *inter alia*, the Park and Refuge's physical environment, *id.* at 194–210, the habitat of the elk, *id.* at 211–54, other wildlife, including threatened and endangered species, *id.* at 351–66, human health and safety, *id.* at 443–56, and recreational and tourism related activities, *id.* at 457–93. Importantly, the EIS noted that "[t]he level of analysis [in the report was] sufficient to allow several management actions to be carried out without having to complete additional environmental analyses (e.g., environmental assessments) prior to implementation." *Id.* at 191.

The 2007 Plan also was required to comply with the Endangered Species Act ("ESA") due to the Plan's potential

to affect the Greater Yellowstone Ecosystem ("GYE") population of grizzly bears, *see id.* at 351, a species that had been listed as "threatened" since 1975, *see* Amendment Listing the Grizzly Bear of the 48 Coterminous States as a Threatened Species, 40 Fed. Reg. 31,734 (July 28, 1975). Accordingly, the Park Service consulted with the FWS over the matter. The FWS then issued a biological opinion determining that the implementation of the 2007 Plan's preferred alternative was not likely to jeopardize the existence of the grizzly bear, but might result in some take of grizzlies by elk hunters. *See* Bison and Elk Management Plan: National Elk Refuge and Grand Teton National Park (Apr. 2007), Appendix E, at 171–98, *reproduced at* J.A. 645–72, 830–61, *available at* https://www.fws.gov/bisonandelkplan/. In 2012, an elk hunter killed a grizzly bear, prompting the Park Service to consult again with the FWS. In 2013, the FWS issued an addendum to its 2007 biological opinion, estimating that a total of five grizzly bears would be taken in the Park during the fifteen-year period covered by the 2007 Plan. Memorandum from Field Supervisor, U.S. FWS to Superintendent, Nat'l Park Service (Sept. 13, 2013), *reproduced at* J.A. 867–904, 870.

## B. Procedural Background

The Park Service has authorized elk hunting in Grand Teton in reliance on its 2007 Plan and EIS in every year since the Plan was adopted. On October 20, 2014, local wildlife photographers Timothy Mayo and Kent Nelson brought suit in the District Court, challenging the annual hunting authorizations as contrary to the Grand Teton National Park Act ("Enabling Act"), 16 U.S.C. § 673c(a), National Park Service Organic Act ("Organic Act"), 16 U.S.C. § 1, Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), ESA, 16 U.S.C. § 1531, and NEPA, 42 U.S.C. § 4321 *et seq.*

Complaint for Declaratory and Injunctive Relief, ¶¶ 68–80, *reproduced at* J.A. 33–37. On July 1, 2015, the plaintiffs filed a supplemental complaint, incorporating by reference each of the statutory claims to also apply to the Park Service's 2015 authorization of elk hunting in the Park. Supp. Complaint, ¶¶ 1–8, J.A. 39–41. The State of Wyoming and Safari Club International intervened as defendants before the District Court. *Mayo*, 177 F. Supp. 3d at 105.

With respect to their NEPA claims, the plaintiffs argued that the Park Service was required to issue a new EA or EIS every year during the fifteen-year term of the elk-reduction program. Complaint, ¶¶ 73–74, J.A. 35; *Mayo*, 177 F. Supp. 3d at 107. They contended that changes had occurred after the agency promulgated the 2007 Plan and EIS – most notably, the FWS's continued use of supplemental feeding on the Refuge – necessitating a supplemental EIS. *Mayo*, 177 F. Supp. 3d at 117, 122.

The plaintiffs also challenged the biological opinion and its 2013 addendum as arbitrary and capricious for failing to address the possibility that elk viscera left by hunters "harass" grizzly bears within the meaning of the ESA's take prohibition. *Id.* at 142–45. As explained above, this claim is now moot, so it will not be addressed in this opinion.

Mayo and Nelson moved for summary judgment on July 21, 2015. The Park Service, FWS, and intervenors opposed that motion and cross-moved for summary judgment in their favor.

On March 29, 2016, the District Court entered summary judgment for the government on the Enabling Act, Organic Act, and NEPA claims. *Id.* at 91, 146. With respect to the NEPA claims, the District Court held that the Park Service

could rely on the 2007 EIS in making its annual elk-reduction decisions because that document "took the requisite 'hard look' at the potential environmental effects that might result from continuing the elk reduction program in the Park as a method of managing the herd." *Id.* at 109. The District Court rejected the plaintiffs' contention that the agencies had abandoned the 2007 Plan, and held that a supplemental EIS was not required since the record lacked evidence that the FWS's supplemental feeding practices "on the Refuge [have] had a spillover effect on the environmental impacts of elk hunting in the Park." *Id.* at 122.

Accordingly, on August 1, 2016, the District Court entered final judgment on all counts in the government's favor. *Mayo v. Jarvis*, 203 F. Supp. 3d 31, 42 (D.D.C. 2016). Kent Nelson, but not Timothy Mayo, has now appealed the denial of his motion for summary judgment and the entry of judgment for Appellees.

## I. ANALYSIS

### A. Standard of Review

We review the District Court's grant and denial of summary judgment *de novo*. *Theodore Roosevelt Conserv. P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011). Because NEPA does not provide a private right of action, the agencies' compliance with NEPA is reviewed under the Administrative Procedure Act ("APA") "and its deferential standard of review." *Sierra Club*, 867 F.3d at 1367.

The APA requires that we "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious "if the

agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Duncan's Point Lot Owners*, 522 F.3d at 376 ("We will overturn an agency's decision not to prepare an EIS only if that decision was arbitrary, capricious, or an abuse of discretion."). In evaluating whether the agency has met this standard, the court must "not . . . substitute its [own] judgment for that of the agency." *State Farm*, 463 U.S. at 43.

As noted above, the Supreme Court has emphasized that "inherent in NEPA and its implementing regulations is a 'rule of reason.'" *Pub. Citizen*, 541 U.S. at 767 (quoting *Marsh*, 490 U.S. at 373). The rule of reason governs our review of an agency's environmental analysis, *N. Slope Borough v. Andrus*, 642 F.2d 589, 600 (D.C. Cir. 1980), decision not to prepare a NEPA analysis, *Pub. Citizen*, 541 U.S. at 767, and decision not to supplement an existing EIS, *Marsh*, 490 U.S. at 373–74. The standard "ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Pub. Citizen*, 541 U.S. at 767; *see also Marsh*, 490 U.S. at 373–74. "The overarching question is whether an EIS's deficiencies are significant enough to undermine informed public comment and informed decisionmaking." *Sierra Club*, 867 F.3d at 1368 (citing *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).

A court's "role in reviewing an agency's decision not to prepare an EIS is a 'limited' one, 'designed primarily to ensure that no arguably significant consequences have been ignored.'" *Myersville Citizens for a Rural Cmty., Inc. v.*

*FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (quoting *TOMAC v. Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006)). Necessarily, then, "[w]here the preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a whole, no rule of reason worthy of that title would require an agency to prepare an EIS." *Pub. Citizen*, 541 U.S. at 767 (internal quotation marks omitted).

**B. Appellant's Claim Regarding the Need for an Annual NEPA Assessment**

Appellant's primary argument on appeal is that each annual hunting authorization constitutes a "major Federal action" that triggers NEPA's mandate that the agency prepare an EA or EIS. 42 U.S.C. § 4332(2)(C); *see* CEQ regulations, 40 C.F.R. § 1508.18 (defining "Federal action" to include "continuing activities" and approvals by federal agencies of "specific projects, such as . . . management activities located in a defined geographic area" and "actions approved by permit"); *id.* § 1508.27 (defining "significantly"). Appellant offers three arguments in support of his claim that the 2007 EIS cannot satisfy this statutory requirement: (1) the 2007 Plan did not disclose the particulars of each future annual hunt; (2) the agencies have stopped implementing the Plan; and (3) significant new information bearing on the environmental effects of hunting have never been analyzed.

Intervenor-Appellee Wyoming argues that the Park Service's authorization of the 2015 elk-reduction program is not a "major Federal action" since it is "simply one step in the agency's ongoing management of the elk and bison herds under the fifteen-year term of the 2007 Plan." Wyoming's Br. 34. The Park Service, in turn, contends that *even if* each hunting authorization is a "major Federal action" which may "significantly affect" the environment, the 2007 EIS relieved

the Park Service of the obligation to prepare fresh NEPA documentation each year it implements the elk-reduction program in conformity with the 2007 Plan. Appellees' Br. 28–44. We agree with the Park Service.

Once an agency has taken a "hard look" at "every significant aspect of the environmental impact" of a proposed major federal action, *Balt. Gas*, 462 U.S. at 97 (quoting *Vt. Yankee*, 435 U.S. at 553), it is not required to repeat its analysis simply because the agency makes subsequent discretionary choices in implementing the program. As discussed above in part I.A, an agency may rely on an already-performed, "thorough and comprehensive" NEPA analysis. *New York v. U.S. Nuclear Regulatory Comm'n (New York II)*, 824 F.3d 1012, 1019 (D.C. Cir. 2016).

In this case, the Park Service published a thorough and detailed EIS in 2007. Appellant has identified no significant way in which the subsequent hunting authorizations deviated from the assessment made in 2007. NEPA does *not* impose a duty on agencies "to include in every EIS a detailed explanation of specific measures which will be employed to mitigate the adverse impacts of a proposed action." *Robertson*, 490 U.S. at 353 (internal quotation marks and emphasis omitted). And an agency is not required to make a new assessment under NEPA every time it takes a step that implements a previously studied action. *See Marsh*, 490 U.S. at 373. So long as the impacts of the steps that the agency takes were contemplated and analyzed by the earlier NEPA analysis, the agency need not supplement the original EIS or make a new assessment. *See Nat'l Comm. for the New River*, 373 F.3d at 1330. The 2007 EIS was clearly sufficient to cover elk hunting during the ensuing fifteen years under the 2007 Plan absent a material change causing unforeseen environmental consequences.

*1. Adequacy of the 2007 EIS*

In preparing the 2007 EIS, the agencies took a hard look at the potential environmental effects of the program to reduce the Jackson elk herd through annual hunting determinations. Spanning more than 600 pages, the EIS analyzed the effects of elk hunting on a variety of relevant environmental factors. For example, the EIS described how the elk-reduction program would likely affect the elks' mortality potential, *see* 2007 Plan and EIS at 258, 296, the overall size of the Jackson herd, and the concomitant ability of the Park Service to accomplish the Plan's population goals for the elk, *see id.* at 466–67, 471–72. The EIS considered the effect of hunting on the density of the herd and distribution of the elk throughout the Park and Refuge, *id.* at 288–90, as well as on calving, age, and sex ratios of the elk, *id.* at 294–95. The EIS additionally explained how hunting might affect the elks' social practices, potentially increasing the elks' "nervousness, energetic expenditures, and possibly decreasing nutrition because of reductions in foraging." *Id.* at 291.

The EIS also took into account the elk-reduction program's likely consequences on other wildlife, including various amphibians, *id.* at 434, as well as mule deer, moose, and pronghorn and bighorn sheep, *e.g.*, *id.* at 399, 377–78. It specifically addressed the effects of hunting on species listed under the ESA, such as the grizzly bear, describing how the presence of hunters in particular hunting areas within the Park and the changing scope of the hunt over time might impact such species. *Id.* at 353. For example, the EIS considered the possibility that elk hunters might kill grizzly bears, *id.* at 357, and, more optimistically, produce an additional source of nutrition for grizzlies, wolves, and bald eagles by creating elk "gut piles" for the animals to scavenge, *id.* at 359.

In addition, the EIS considered the elk-reduction program's relation to the region's human environment. It evaluated the likelihood that hunting would cause injury, *id.* at 449, increase the risk of traffic accidents, *id.* at 448–49, and reduce visitors' opportunities to observe the elk, *id.* at 462–64, including for purposes of wildlife photography, *id.* at 457–58. The EIS further explained that by bringing people into proximity with the elk, hunting might increase the risk that humans catch diseases from the animals. *Id.* at 449, 451.

The EIS analyzed more than just the environmental effects of the elk-reduction program. It also evaluated alternative uses of hunting as an elk-management tool. For instance, it considered changing hunting practices by closing traditional hunting areas and opening non-traditional areas. *Id.* at 279–80. It thoroughly discussed the possibility of eliminating hunting completely from the Park and Refuge. *E.g.*, *id.* at 265–68, 272–73, 321. And it contained a detailed discussion of possible mitigation measures where relevant to the environmental risks it identified.

All in all, given the level of detail in the assessment, there is no question that the 2007 EIS "adequately considered and disclosed the environmental impact of" the 2007 Plan's preferred elk-reduction program, its necessity, and its alternatives. *Nevada*, 457 F.3d at 93 (quoting *Balt. Gas*, 462 U.S. at 97–98).

This appeal does not involve an arbitrary and capricious challenge to the Park Service's annual decisions to authorize elk hunting in Grand Teton. Instead, Appellant faults the Park Service for not preparing a NEPA analysis each year during the fifteen-year term of the 2007 Plan to document each "hunt's timing, location, restrictions, and . . . potential

alternatives for avoiding or minimizing impacts." Appellant's Br. 41. As we have already explained, what Appellant seeks is much more than is required by NEPA. The Park Service's mere implementation of the 2007 Plan, without more, did not result in any "*seriously* different picture of the environmental landscape." *Nat'l Comm. for the New River*, 373 F.3d at 1330. All the environmental effects seen during the years after the promulgation of the 2007 Plan and EIS had been anticipated and analyzed in the original environmental assessment. Therefore, the Park Service had no duty to prepare a supplemental or new EIS.

## 2. *Agency Discretion to Determine When and How to Engage in NEPA Analysis*

NEPA does not prevent an agency from satisfying future NEPA obligations by performing a NEPA analysis at the outset of a long-term project. The decision in *New York II*, 824 F.3d at 1016, confirms this point. In that case, the Nuclear Regulatory Commission had prepared a "Generic Environmental Impact Statement" concerning the effects of on-site storage of spent nuclear fuel. The agency issued a rule that "incorporate[d] the findings of the [EIS] into all future reactor licensing proceedings," *id.*, and this court upheld that rule and EIS as lawful under NEPA, *id.* at 1016–23. Therefore, it is clear here that the agencies' decision to adopt a fifteen-year plan supported by one EIS was permissible under NEPA.

To be sure, agencies are not always free to comply with NEPA by issuing a single EIS at the outset of a long-term project. An environmental analysis that occurs too early in the planning process may lack "meaningful information" necessary for informed consideration. *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1093–

94 (D.C. Cir. 1973). Thus, if a program "involves . . . separate sub-projects and will take many years," NEPA's implementing regulations allow the agency to "evaluate[] each sub-project as it becomes ready" and tailor its subsequent analyses to particularized considerations not already addressed in a prior "programmatic EIS." *Nevada*, 457 F.3d at 91; *see* CEQ regulations, 40 C.F.R. § 1508.28. "Tiering" – as this process is known – is "appropriate when it helps the lead agency to focus on the issues which are ripe for decision *and exclude from consideration issues already decided* or not yet ripe." CEQ regulations, 40 C.F.R. § 1508.28(b) (emphasis added).

In *Theodore Roosevelt Conservation Partnership v. Salazar*, for example, the Bureau of Land Management approved drilling permits based on EAs that tiered to a programmatic EIS. 616 F.3d 497, 506 (D.C. Cir. 2010). Plaintiffs argued that the specific approvals were arbitrary and capricious because the underlying EIS used an outdated scientific method for measuring the project's effects on ozone concentrations. *Id.* at 510–11. This court rejected that argument, stating, "[w]hile courts have required [EAs] to analyze certain impacts for the first time when the broader analysis did not address the impact in question *at all*, this is not such a case." *Id.* at 512 (citation omitted). The earlier EIS already "address[ed] the impact drilling would have on ozone concentrations" and "[n]othing in the law requires agencies to reevaluate their existing environmental analyses each time the original methodologies are surpassed by new developments." *Id.*

Appellant claims that *Theodore Roosevelt* supports his argument. In that case, Appellant argues, the court rejected the plaintiffs' challenges in part because the agency committed to performing an EA before approving any specific

application to drill. Appellant's Br. 42–45. That is true enough, as far as it goes. When an earlier impact statement fails to take a hard look at a component of a plan that is major and may itself significantly affect the environment, the agency must do so through an EA or EIS prior to taking the action. But *Theodore Roosevelt* expressly excused the agency from conducting subsequent environmental analyses of issues already thoroughly evaluated in the earlier impact statement. *See* 616 F.3d at 512. Under the rule of reason, subsequent "site-specific" NEPA analyses are required only for "those localized environmental impacts that were not fully evaluated in the program statement." *Scientists' Inst. for Pub. Info.*, 481 F.2d at 1093. When all relevant environmental issues have already been analyzed and decided, additional EAs or supplementation are not required.

Furthermore, it was for the Park Service to decide whether to perform the environmental analysis in a comprehensive EIS or in narrower annual documentation. In *Natural Resources Defense Council, Inc. v. U.S. Nuclear Regulatory Commission*, we explained that the agency, "in its discretion, could have chosen to explore alternatives to the particular tanks in either a 'programmatic' or 'site-specific' format." 606 F.2d 1261, 1271 (D.C. Cir. 1979); *see also Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 374 n. 73 (D.C. Cir. 1981) ("[T]he decision whether to prepare a programmatic impact statement is committed to the agency's discretion."). Appellant has not shown that it was arbitrary and capricious for the Park Service to perform the required NEPA analysis in a single EIS.

3. *Consistency of the Annual Hunts with the 2007 Plan and 2007 EIS's Projections*

The record indicates that the Park Service has implemented the elk-reduction program in the manner envisioned by the 2007 Plan and analyzed in the 2007 EIS. The Plan and EIS predicted that the number of deputized hunters in the Park would decline from an average of 1,600 hunters per year to 773–957 and, over "the long term," the number of elk harvested would decline from an average of 480 elk per year to 232 to 287 elk per year. 2007 Plan and EIS at 472. Over the last ten years, the number of elk authorized to be hunted in the Park has declined from 600 to 300, with fewer hunters deputized to hunt elk in both the Park and Refuge combined than the Plan allowed for the Park alone. In sum, the record confirms that the Park Service's elk hunting authorizations have been within the range of the Plan's expectations, on which the 2007 EIS based its analysis.

Appellant's argument that the agencies have abandoned the 2007 Plan has no merit. The record indicates only one implementation failure under the 2007 Plan – the FWS's failure to decrease supplemental feeding on the Refuge – which is addressed below. However, the record also shows that the 2007 Plan as a whole – including its monitoring, education, adaptive management, and hunting programs – has been followed. Furthermore, as noted above, "NEPA is 'not a suitable vehicle' for airing grievances about the substantive policies adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'" *Grunewald*, 776 F.3d at 903 (quoting *Found. on Econ. Trends*, 817 F.2d at 886). Therefore, Appellant's policy preference for reduced supplemental feeding is beyond the scope of our review of his NEPA challenge. The agencies' 2007 NEPA assessment satisfied the requirements of the law for the annual elk hunts. The subsequent failure of the FWS to cut back on supplemental feeding does not undermine this conclusion, especially when the record indicates that all of the potential

environmental effects of the Plan were fully addressed in the 2007 EIS and the principal policy objectives of the 2007 Plan are being met.

## C. Appellant's Challenge to the FWS's Supplemental Feeding

The question remains whether the FWS's failure to cut back on supplemental feeding is otherwise unlawful. Appellant makes much of the fact that the weaning of the herd from supplemental feeding was one of the methods adopted by the 2007 Plan to manage the population of the elk herd. And Appellant complains that, despite committing to working toward a "complete transition" away from supplemental feed to "free-standing forage" on the Refuge, the FWS's supplemental feeding has continued on the Refuge and the number of elk wintering there has increased over the last ten years. Although the FWS never committed to ending supplemental feeding by any specific date, its failure to decrease supplemental feeding obviously is not in keeping with one of the goals of the Plan. *See Defs. of Wildlife*, 651 F.3d at 117 (noting that "the agencies are committed to ending supplemental feeding").

There are two glaring problems with Appellant's complaint. First, as noted above, the failure of the FWS to cut back on supplemental feeding does not indicate that the 2007 Plan has failed with respect to elk hunting.

Second, as Appellant's counsel conceded during oral argument before this court, this case does not directly challenge supplemental feeding. Oral Arg. Recording 37:00–48. The Fish and Wildlife Service, not the Park Service, is responsible for the supplemental feeding program, which takes place on the Refuge, not in the Park. And Appellant has

brought no viable legal action against the FWS to contest the supplemental feeding program. In an effort to overcome this problem, Appellant argues that the FWS's failure to decrease supplemental feeding represents a substantial change in the environmental consequences of the elk-reduction program requiring supplemental NEPA analysis. This is a clever claim, but it fails.

The heart of Appellant's claim appears to be that if supplemental feeding is not reduced then hunting necessarily must continue in order to ensure that the size of the elk herd does not exceed the projections of the 2007 Plan. On this theory, Appellant argues that the Park Service must publish new NEPA analyses evaluating whether hunting continues to be necessary in light of the fact that supplemental feeding has not declined. We reject this argument. The EIS clearly and exhaustively contemplated the continuation of the elk-reduction program over the life of the fifteen-year Plan. And while it is not implausible to assume that the Park Service might have authorized more hunting than the 2007 Plan contemplated because of the FWS's failure to decrease supplemental feeding, the record refutes this assumption.

As explained above, the Park Service's implementation of the annual elk-reduction program has met the population goals of the 2007 Plan and EIS. From 2007 to 2015, the size of the herd decreased, as did the number of deputized hunters and the number of elk authorized to be harvested. In other words, the number of elk authorized to be harvested and the number of hunters deputized to participate in hunts did not increase as a result of the FWS's continued use of supplemental feeding. Therefore, Appellant has failed to demonstrate any "substantial change[] *in the proposed action*" – elk hunting in Grand Teton – "relevant to environmental concerns" or any "significant new circumstances or

information relevant to environmental concerns *and bearing on the proposed action or its impacts*." CEQ regulations, 40 C.F.R. § 1502.9(c) (emphases added).

We reiterate that, in reaching this conclusion, a crucial consideration here is the fact that the "proposed action" challenged in this case is the Park Service's authorization of elk hunting in Grand Teton, not the FWS's supplemental feeding practices on the Refuge. The admitted variance between the Plan's proposed supplemental feeding program and that program's implementation simply does not "provide[] a *seriously* different picture of the environmental landscape" of hunting. *Nat'l Comm. for the New River*, 373 F.3d at 1330 (quoting *Olmsted Falls*, 292 F.3d at 274). No supplementation is therefore required. *See Marsh*, 490 U.S. at 373 ("[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized."); *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 196 (D.C. Cir. 2013) (rejecting supplementation claim because the "[p]etitioners failed to indicate any environmental data that were not considered in the EIS").

If Appellant wishes to challenge the merits of the FWS's supplemental feeding program, he will have to pursue an appropriate action against the FWS directly.

## III. CONCLUSION

For the reasons set forth above, we affirm the judgment of the District Court on the NEPA claims. We vacate the District Court's judgment as to the ESA claim, which is now moot.

*So ordered.*