**SOUTHERN UTAH WILDERNESS ALLIANCE, et al., Plaintiffs,**

v.

**Gale NORTON, Secretary of the Department of the Interior, et al., Defendants.**

**No. CIV.A. 03–2406(JDB).**

United States District Court, District of Columbia.

April 27, 2004.

F.Supp.2d 18, 28 (D.D.C.2001).

Sharon Buccino, Natural Resources Defense Council, Washington, DC, for Plaintiffs.

Ruth Ann Storey, U.S. Department of Justice, Environmental & Natural Resources, GLS, Washington, DC, for Defendants.

## MEMORANDUM OPINION

BATES, District Judge.

In this action for declaratory and injunctive relief, plaintiffs Southern Utah Wilderness Alliance ("SUWA"), Natural Resources Defense Council ("NRDC"), and the Wilderness Society ("WS") challenge the decision of Gale Norton ("Norton"), Secretary of the Department of the Interior ("DOI"), and the Bureau of Land Management ("BLM") to permit the sale of 21 oil and gas leases on approximately 25,000 acres of BLM-managed lands in Utah. Compl. at ¶ 1. Plaintiffs contend that defendants violated the National Environmental Policy Act ("NEPA") because they failed to prepare an environmental impact statement ("EIS") on the effects of oil and gas development on the 21 parcels at issue. Plaintiffs seek to enjoin the sale or issuance of leases until BLM prepares an EIS or other environmental assessment.

Presently before the Court is defendants' motion to transfer venue to the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1404(a). Defendants assert that the controversy in this case specifically concerns lands in Utah and the citizens of Utah, that the administrative record is located in Utah, and that transfer would not inconvenience the parties. For the reasons explained below, defendants' motion to transfer will be granted.

## BACKGROUND

Plaintiffs are non-profit environmental membership organizations. SUWA is headquartered in Salt Lake City, Utah, and has an office in the District of Columbia. It has members in all fifty states and is committed to "the sensible management of all public lands within the State of Utah, to the preservation and protection of plant and animal species, and to the preservation of Utah's remaining wild lands." Compl. at ¶ 7. NRDC has more than 400,000 members throughout the United States and offices in the District of Columbia. WS is headquartered in the District of Columbia and has over 200,000 members throughout the country.

BLM is an agency within DOI responsible for carrying out DOI's statutory and regulatory obligations governing oil and gas exploration, leasing, and development. The agency manages lands identified as Wilderness Study Areas (WSAs) until Congress decides to preserve these lands as wilderness. *See Interim Management Policy for Lands Under Wilderness Review,* H–8550–1, *available at* http://www.ut.blm.gov/utahwilderness/imp/imp. htm (last updated Dec. 22, 2003); *see also* 43 U.S.C. § 1782(c) ("During the period of [wilderness] review ... the Secretary shall continue to manage such lands ... so as not to impair the suitability of such areas

for preservation of wilderness."). In 1999, BLM completed a wilderness inventory and identified 2.6 million acres in Utah that had wilderness character. *1999 Utah Wilderness Inventory, available at* http://www.ut.blm.gov/utahwilderness/back ground.htm (last updated Apr. 1, 2004); *see also* Wilderness Act of 1964, 16 U.S.C. § 1131(c) (defining "wilderness character" as wilderness features associated with "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain").

In addition to maintaining public lands during wilderness reviews, each BLM state office conducts a competitive oil and gas lease sale at least four times each year if public lands are available for such competitive leasing. 43 C.F.R. § 3120.1–2. Prior to a policy change in April 2003, proposed actions on parcels in Utah identified as having wilderness character, but not yet designated as WSAs, were stayed until the wilderness value of the parcels could be addressed through land use plans. *Compare* Instruction Memorandum No.2003–195, Rescission of National Level Policy Guidance on Wilderness Review and Land Use Planning, *available at* http://www.blm.gov /nhp/efoia/wo/ fy03/im2003–195.htm (last visited April 26, 2004), *with Wilderness Inventory and Study Procedures Handbook,* H–6310–1, at .06(F) (Jan. 9, 2001). As a result, BLM rarely issued oil and gas leases in these areas between January 2001 and November 2003. Pl's Memo. at Ex. 1, ¶ 7.

In April 2003, Norton signed an agreement with the State of Utah settling litigation in which Utah had challenged BLM's authority to identify and protect lands with wilderness character. Stipulation and Joint Motion to Enter Order Approving Settlement and to Dismiss the Third Amended and Supplemented Complaint,

*Utah v. Norton,* No. 96 Civ. 0870(B) (D.Ut. Apr. 11, 2003). Plaintiffs maintain that the settlement agreement significantly altered BLM land management policies. *See* Pl's Memo. at 3. Specifically, plaintiffs contend that the settlement resulted in the designation of fewer WSAs, permitting oil leases in areas with wilderness character allegedly like the ones at issue in this case. *Id.* at 6–7.

In the summer of 2003, BLM's Utah office published a preliminary list of 55 parcels for an oil and gas lease sale to occur on November 24, 2003. BLM and wilderness groups had determined that 21 of these proposed parcels have wilderness character. Compl. at ¶¶ 26, 29. To prepare for these sales, on August 11, 2003, a BLM Utah state office employee sent an email and paper to four BLM headquarters officials in the District of Columbia that asked: "Is our approach consistent with the recent Utah wilderness lawsuit settlement, land use planning handbook, anticipated direction from the Washington office, and other policy?" Pl's Memo. at Ex. 8. It then stated that "[w]e believe it reflects the approach we have discussed with the Washington office about in recent telephone conversations. We welcome your comments." *Id.*

Subsequently, BLM officials from Washington spent two days in Utah at a workshop allegedly instructing BLM's Utah officials to lease lands having wilderness character quickly and without further NEPA review. Pl's Memo. at 10. BLM's Utah field officers were required to attend this workshop prior to completing NEPA documentation for the November lease sales. Pl's Memo. at Ex. 11. After this meeting, a BLM headquarters official circulated a memorandum stating that a proposed lease sale did not need new NEPA documentation to analyze the effects of the sale on areas determined to have wilderness character. Pl's Memo. at Ex. 12.

Plaintiffs furthermore argue that the lease process was colored by the National Energy Policy (NEP). They note that the NEP emphasized increasing oil and gas exploration and production on federal lands and directed BLM staff to "look for opportunities to improve and streamline the management of the NEPA process to all energy proposals." National Energy Policy, Report of the National Energy Policy Development Group 3–13, *available at* www.whitehouse.gov/energy (May 16, 2001). Plaintiffs allege that one BLM official from Washington involved with energy policy had "regular contact" with BLM's Utah employees relating to the disputed lease sales, although plaintiffs do not specify whether or how that contact related to the NEP or any other specific energy policy. NEP implementation required BLM to identify land use plans as "time-sensitive." Pl's Memo. at Ex. 14. One of the plans, the Vernal resource management plan, includes three of the parcels at issue. *Id.* BLM previously identified these three parcels as having wilderness character. Compl. at ¶ 27.

SUWA filed a protest with Utah BLM regarding the 21 parcels at issue. Utah BLM has not yet issued a decision on the protest. Def's Mot. to Transfer Venue at Ex. 1, ¶ 10. On November 24, 2003, BLM's Utah state office conducted the lease sale. *Id.* at ¶ 11.

In the intervening months, the parcels at issue have received some national attention. More than 160 Members of Congress have proposed wilderness protection for various lands, including these 21 lease parcels. *See* America's Redrock Wilderness Act, S. 639, 108th Cong. (2003); H.R. 1796, 108th Cong. (2003). NRDC members throughout the United States have sent more than 90,000 electronic messages

to Congressional members and the BLM, requesting that the federal government protect Utah's wilderness. Various newspaper articles have addressed these disputed lands, including an editorial in *The New York Times* and an article in the *Washington Post.* Pl's Memo. at Exs. 15–18.

Defendants agree that judicial review in this case is limited to the administrative record and that neither side is likely to call witnesses. Def's Mot. to Transfer Venue at 10. Defendants and NRDC have counsel in Washington, D.C., and SUWA has counsel in Salt Lake City.

## ANALYSIS

### A.   Legal Standard

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). To support a motion to transfer, the moving party must demonstrate that the "balance of convenience of the parties and witnesses and the interest of justice are in [its] favor." *Consol. Metal Products v. Am. Petroleum Inst.,* 569 F.Supp. 773, 774 (D.D.C.1983). The moving party "bear[s] a heavy burden of establishing that plaintiffs' choice of forum is inappropriate." *Pain v. United Tech. Corp.,* 637 F.2d 775, 784 (D.C.Cir.1980).

Courts engage in a case-by-case consideration of convenience and fairness when assessing a motion to transfer venue. *SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1154 (D.C.Cir.1978) (citing *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). Courts balance a number of private and public interest factors, including (1) plaintiff's forum choice; (2) defendant's forum choice; (3) whether the claim arose elsewhere; (4) convenience of the parties; (5) convenience of the witnesses; (6) ease of access to the proof; (7) transferee's competence; (8) congestion of both courts; and (9) local interest in deciding local controversies at home. *Trout Unlimited v. United States Dep't of Agric.,* 944 F.Supp. 13, 16 (D.D.C.1996); *see also Greater Yellowstone Coalition v. Bosworth,* 180 F.Supp.2d 124, 127–28 (D.D.C. 2001).

Before conducting this analysis, however, the Court must decide under 28 U.S.C. § 1404(a) whether plaintiffs could have brought this suit in the transferee forum. *See Thayer/Patricof Educ. Funding v. Pryor Resources, Inc.,* 196 F.Supp.2d 21, 32 (D.D.C.2002). Venue is proper in a case involving a federal question, such as this one, in the "judicial district in which ... a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(e)(2). Here, venue would be proper in the District of Utah because the dispute concerns land in Utah, BLM's Utah state office was involved in the leasing decisions, and the actual lease auction occurred in Utah. Indeed, both parties agree that this case could be brought in the District of Utah. Pl's Memo. at 7; Def.'s Mot. to Transfer Venue at 6.

### B.   Private Interests

Courts give considerable deference to the plaintiff's choice of forum. *Trout Unlimited,* 944 F.Supp. at 17; *see also Thayer/Patricof Educ. Funding,* 196 F.Supp.2d at 31. That deference, however, is lessened when plaintiff's forum choice "lacks meaningful ties to the controversy and [has] no particular interest in the parties or subject matter." *Islamic Republic of Iran v. Boeing Co.,* 477 F.Supp. 142, 144 (D.D.C.1979); *compare Greater Yellowstone Coalition,* 180 F.Supp.2d at 128 (finding a nexus to Wash-

ington because senior federal officials in the city participated in discussions to reissue the challenged permits, two of the five plaintiffs had offices in the District of Columbia, and the case involved federal statutes), *with Hawksbill Sea Turtle v. Fed. Emergency Management Agency,* 939 F.Supp. 1, 3–4 (D.D.C.1996) (finding an "insubstantial factual nexus" with the plaintiff's forum choice of Washington because the temporary emergency housing project, species habitat, and alleged violations of environmental law occurred in the Virgin Islands).

Plaintiffs contend that this controversy is substantially tied to Washington because the wilderness policy changes made by Norton and other senior officials had a direct impact on the lease sales in Utah. Pl's Memo. at 8. Plaintiffs direct the Court to evidence establishing such ties, including an email and paper that an employee in BLM's Utah state office sent to headquarters inquiring whether their leasing approach was consistent with headquarters' policy. Pl's Memo. at 9. Plaintiffs also emphasize the two-day workshop that BLM headquarters officials conducted in Utah instructing Utah BLM personnel on leasing the lands in dispute. *Id.* at 10. Finally, plaintiffs aver that one BLM official in Washington "intimately involved" with the National Energy Policy emailed staff in BLM's Utah office ten times regarding lease sales. *Id.* at 13.

In response, defendants assert that these examples fail to demonstrate "special oversight by Washington of Utah BLM's mineral leasing program." Def's Reply at 5. BLM's Utah state office administered the public lands at issue, BLM's Utah State Director had authority to issue oil and gas leases, and the lease sale occurred in Utah under the direction of BLM's Utah state office. Def.'s Reply at 3, 5.

The primary issue in this case is not DOI's change in its wilderness policy; instead, it is the BLM Utah state office's proposal to sell the 21 parcels and the procedures it followed. Even if BLM headquarters officials changed the wilderness policy with respect to leasing lands with wilderness character, the actual lease decisions regarding the 21 parcels in dispute were made by officials in BLM's Utah office. Def's Mot. to Transfer Venue at Ex. 1, ¶ 9. Despite the two-day workshop and correspondence between the Utah and Washington offices, BLM's headquarters officials were not actively involved in the decision to lease the 21 parcels and the process employed. Indeed, their only involvement stemmed from the wilderness policy change, and the resulting guidance to BLM's Utah state office was meant only to ensure that this change occurred. Although extensive involvement by headquarters has, in some instances, been held to justify keeping a case in this jurisdiction, *see Wilderness Soc'y v. Babbitt,* 104 F.Supp.2d 10, 14 (D.D.C.2000) (denying motion to transfer to Alaska in part because of the Secretary's "heavy involvement" in DOI's review of the impact of oil and gas leasing on the environment, including his visit to Alaska for six days in order to meet with residents and government and industry officials and his signing and public briefing of the decision in Washington, D.C.), "mere involvement on the part of federal agencies, or some federal officials who are located in Washington, D.C., is not determinative." *Shawnee Tribe v. United States,* 298 F.Supp.2d 21, 25–26 (D.D.C.2002).

■ Additionally, neither party would be significantly inconvenienced by having to litigate this case in Utah. Although the plaintiffs have offices in Washington, D.C., SUWA is headquartered in Salt Lake City and one of plaintiffs' attorneys resides in

Utah. Plaintiffs are certainly correct that defendants would not experience hardship litigating this matter in this forum. However, the location of defense attorneys is not a strong consideration when defendants move for transfer. *See Northwest Forest Resource Council v. Babbit,* 1994 WL 908586, *3 n. 6 (D.D.C.1994) ("Although defendant's counsel are located in the District of Columbia, any inconvenience to them is offset by the fact that they represent the party requesting the transfer.").[1]

Finally, both parties agree that witnesses will not be necessary and that review will be based upon the administrative record. Def's Mot. to Transfer Venue at 10; Pl's Reply Memo. at 16. Although the record is in BLM's Utah state offices, its location should be afforded little weight. *See Air Line Pilots Ass'n v. Eastern Air Lines,* 672 F.Supp. 525, 527 (D.D.C.1987) ("Once the material is photocopied, boxed, and sent to the District, it would not be a significantly greater hardship to send an additional copy of these documents to the courthouse.").

In sum, because the issues in this case primarily involve decisions of officials in Utah, and because no relevant records or witnesses are available exclusively in this jurisdiction, the private interests of the parties favor transfer to the District of Utah.

## C. Public Interest

The public interest similarly favors transfer. The controversy is localized in the sense that it involves Utah lands, hence there is a strong local interest in having this case heard in Utah. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) ("There is a local interest in having localized contro-

versies decided at home."); *see also Hawksbill Sea Turtle,* 939 F.Supp. at 3 n. 5 (noting the importance of permitting local citizens to attend and observe proceedings in an environmental case). Plaintiffs assert that the environmental organizations have "worked on behalf of hundreds of thousands of members across the country for years to protect the many special places in Utah's canyon country, including the specific area with wilderness character here." Pl's Memo. at 14, Ex. 1 at ¶¶ 2, 3, 6; Ex. 2 at ¶¶ 3–6; Ex. 3 at ¶¶ 2, 3, 5. Thousands of plaintiffs' members have made their opposition to the leases at issue known to their representatives in Congress. And numerous articles and editorials in national publications have focused on the 21 parcels. Pl's Memo. at 15 (citing range of articles).

Notwithstanding this national attention, the dispute remains focused on 21 parcels of land in Utah. Land is a localized interest because its management directly touches local citizens. *See, e.g., Sierra Club v. Flowers,* 276 F.Supp.2d 62, 71 (D.D.C.2003) (granting motion to transfer suit involving the Florida Everglades in part because of the "depth and extent of Florida's interest"); *Trout Unlimited,* 944 F.Supp. at 17 (granting motion to transfer to Colorado a suit involving the United States Forest Service's decision to issue an easement for the operation of a dam and reservoir on public lands because of the "impact that the resolution of this action will have upon the affected lands, waters, wildlife and people of that state"). As plaintiffs concede in their complaint, BLM's failure to conduct an EIS or other environmental assessments could severely impact these lands. Compl. at ¶ 32 ("Construction and operation of wells, towers, pumps, pipelines, roads, and waste pits can

---

1. In any event, defendants suggest that alternative Department of Justice counsel could be appointed to defend this matter in Utah should a transfer inconvenience the present counsel. Def's Reply at 7–8.

destroy wilderness qualities and scenic values, degrade air quality as well as habitat for plants and animals, and negatively affect the quantity and quality of resources. Cultural and historic properties can be destroyed."). It makes sense that these alleged consequences would be most particularly felt in Utah, and thus that the courts of Utah would have a clear interest in resolving the dispute. *See Trout Unlimited*, 944 F.Supp. at 20 (noting that it is appropriate to consider "those whose rights and interests are in fact most vitally affected by the suit") (citing *Adams v. Bell*, 711 F.2d 161, 167 n. 34 (D.C.Cir. 1983)).

Finally, the District Court for the District of Utah has heard similar matters relating to NEPA, and has an interest in doing so.[2] In *Sierra Club v. Hodel*, 737 F.Supp. 629 (D.Utah 1990), environmental groups sought to enjoin the construction of a road between two federally protected wilderness areas until Garfield County and BLM conducted studies of the road's impact on the environment pursuant to NEPA and the Federal Land Policy Management Act. More recently, Judge Kollar–Kotelly of this Court granted a motion to transfer to the District of Utah a case involving oil and gas decisions of BLM's Utah state office. *Southern Utah Wilderness Alliance v. Norton*, No. 01 Civ. 2518, Dkt. No. 22 (D.D.C. June 28, 2002). The court found that Utah's interest in the case was substantial and outweighed any interest in litigating the case in the District of Columbia, rejecting many of the arguments raised by plaintiffs here. This Court agrees with that analysis and concludes that transfer is appropriate because "the dispute in this instance will have the greatest impact on the citizens of Utah." *Id.* at 9.

Based on the strong local interest in having this case in Utah and the District of Utah's competence with NEPA matters, the Court concludes that the public interest factor favors transferring this case to that jurisdiction.

### *CONCLUSION*

For the foregoing reasons, the Court will grant defendants' motion to transfer venue. A separate order accompanies this memorandum opinion.

### *ORDER*

Upon consideration of defendants' motion to transfer venue to the United States District Court for the District of Utah pursuant to 28 U.S.C. § 1404(a), it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that this case shall be TRANSFERRED to the United States District Court for the District of Utah.

---

2. The federal court in Utah is as competent as this Court in analyzing governing federal law. Moreover, the early stage of this case, where this Court has not yet dealt with any merits issues, favors transfer.