KETANJI BROWN JACKSON, United States District Judge
Plaintiffs Western Watersheds Project, Sierra Club, Wyoming Wildlife Advocates, and Gallatin Wildlife Association (collectively, "Plaintiffs") object to the state of Wyoming's use of a feeding site on federal land to conduct a supplemental feeding program for wild elk in the northwestern part of Wyoming. Environmental organizations have previously had limited success in court challenges to supplemental elk feeding initiatives that the federal government (specifically, the U.S. Fish and Wildlife Service and the National Park Service) planned to undertake within Wyoming's National Elk Refuge. See Defenders of Wildlife v. Salazar , 698 F.Supp.2d 141 (D.D.C. 2010), aff'd , 651 F.3d 112 (D.C. Cir. 2011). The instant lawsuit involves a different challenge: Plaintiffs here contest the U.S. Forest Service's issuance of a special-use authorization permit that allows a Wyoming state agency -the Wyoming Game and Fish Commission-to undertake supplemental elk feeding activities on the Alkali Creek Feedground in the Bridger-Teton National Forest. (See Compl., ECF No. 1, ¶ 1.) Plaintiffs have filed the instant action against the Chief of the U.S. Forest Service (Thomas Tidwell) and the Secretary of Agriculture (Sonny Perdue) in their official capacities, claiming that the issuance of the permit violates the Administrative Procedure Act ("APA") and the National Environmental Policy Act ("NEPA"). (See id. ¶¶ 4-6, 15-16.)[1]
Before this Court at present is a motion that Defendants have filed, seeking to transfer the venue of the instant action to the District of Wyoming. (See Defs.' Mot. to Transfer Venue and Mem. in Supp. of Defs.' Mot. to Transfer Venue ("Defs.' Mot."), ECF No. 8; see also Defs.' Reply in Supp. of Mot. to Transfer Venue ("Defs.'
*353 Reply"), ECF No. 14.) Defendants argue that Plaintiffs' choice of forum is not entitled to the usual deference because of the attenuated ties of the instant dispute to the District of Columbia, and that transfer of venue is appropriate because localized controversies should be decided at home. (See Defs.' Mot. at 9-11, 13-14.)[2] Plaintiffs oppose the transfer motion, arguing that just like three previous cases related to "the Jackson elk herd," this case, too, should be resolved in the federal courts of the District of Columbia. (See Pls.' Opp'n to Defs.' Mot. to Transfer Venue ("Pls.' Opp'n"), ECF No. 13, at 8-18.)[3]
For the reasons explained fully below, and after due consideration of the various private and public interest factors pertaining to transfer, this Court has concluded that the agency action that is at issue in this case has its locus in Wyoming, such that transfer to the District of Wyoming is lawful and appropriate and would promote the interests of justice. Accordingly, Defendants' motion to transfer will be GRANTED , and this action will be TRANSFERRED to the District of Wyoming.
I. BACKGROUND
A. Supplemental Feeding Of Elk On Federal Lands In Wyoming
The supplemental feeding of elk began in northwestern Wyoming in the early 1900s in response to large-scale dying of elk in the wintertime. (See Compl. ¶ 30; Final Record of Decision, Long Term Special Use Authorization for the Wyoming Game and Fish Commission to Use National Forest System Land for their Winter Elk Management Activities at Alkali Creek Feedground (December 1, 2015) ("Final ROD"), Ex. A to Defs.' Mot., at 2). Feedgrounds also serve the purpose of preventing elk from roaming onto private lands and damaging stored crops. (See Compl. ¶ 31; Final ROD at 2.) The state of Wyoming has relied on feedgrounds since the 1930s, when Wyoming state statutes began to impose liability on the state-and specifically, on the Wyoming Game and Fish Commission ("WGFC")-for property damage caused by roaming elk herds. (See Final ROD at 2.)[4] Thus, feeding areas are often "strategically placed on and near National Forest System lands" to draw the elk migration routes away from private property. (Id. ) Today, the WGFC conducts supplemental elk feeding at twenty-one feedgrounds and one staging area; eight of those locations are situated on National Forest System lands. (See id. )
Notably, the use of the feedgrounds on National Forest System lands requires authorization from the U.S. Forest Service ("Forest Service"). See 36 C.F.R. § 251.50(a) ("Before conducting a special use [of such lands], individuals or entities must submit a proposal to the authorized officer and must obtain a special use authorization from the authorized officer[.]"). Under the NEPA, prior to providing *354 a special use authorization permit, the Forest Service must prepare an Environmental Impact Statement ("EIS") that evaluates the environmental impact of its decision and must also "issue 'a concise public record of decision[,]' " which is hereinafter referred to as an "ROD." (Compl. ¶ 23 (quoting 40 C.F.R. § 1505.2 ).)
B. The WGFC's Use Of Feedgrounds In The Bridger-Teton National Forest
At issue here is the Alkali Creek Feedground, which is located in the Bridger-Teton National Forest in northwestern Wyoming. (Id. ¶ 1.) There are several different feedgrounds that host the WGFC's elk feeding activities inside the Bridger-Teton National Forest, and the Forest Supervisor of the Bridger-Teton National Forest is the Forest Service official who bears the responsibility of deciding whether or not to authorize supplemental feeding activities on those feedgrounds. (See Final ROD at 3.)
Significantly for present purposes, in 2008, the Forest Supervisor issued a Final EIS and signed an ROD that authorized the WGFC's elk feeding activities in five feedgrounds other than the Alkali Creek Feedground, but postponed the decision regarding the Alkali Creek Feedground to allow for additional analysis. (See id. at 2-3.) More than six years later, on January 23, 2015, the Forest Supervisor finally addressed the Alkali Creek Feedground, by releasing a Final Supplemental EIS and a draft ROD that proposed to authorize the WGFC's use of that feedground. (See Compl. ¶ 46; Final ROD at 3.) The draft ROD prompted a number of written objections, including from several of the Plaintiff organizations in the instant case. (See Compl. ¶ 54; Final ROD at 3.)
Despite those objections, on December 15, 2015, Forest Supervisor Patricia M. O'Connor issued the Final ROD outlining her decision to allow the WGFC to use the Alkali Creek Feedground for its supplemental feeding program. (See Final ROD at 1.) O'Connor reasoned that the use of the feedground was appropriate "because State-operated feedgrounds on National Forest System lands reduce damage to haystack yards and winter pastures on private lands, maintain elk population numbers, and reduce commingling of elk and livestock that can lead to brucellosis transmission." (Id. at 5.) At the same time, O'Connor's final ROD recognized that supplemental feeding programs can be problematic for various reasons, including the fact that such programs play a role in contributing to the spread of chronic wasting disease among elk. (See id. ) Accordingly, the ROD stated that the 2008 special use permit that had been issued to the WGFC with respect to the other feedgrounds in the Bridger-Teton National Forest would be amended to include the Alkali Creek Feedground, but that "this amendment [would] not occur until the [state's] Chronic Wasting Disease Management Plan update is completed and a review by the Forest Supervisor finds that the plan adequately addresses risks and management options for feedgrounds on National Forest System lands." (Id. at 4.) O'Connor also instructed the Forest Service to "review the management practices of all feedgrounds on the [Forest] annually and [to] prepare a report recommending any needed changes." (Compl. ¶ 57 (quoting Final ROD at 4).)
The Forest Service subsequently approved the Wyoming state agency's Chronic Wasting Disease Management Plan, and on December 9, 2016, the agency amended its 2008 special-use authorization, thereby permitting the WGFC to use the *355 Alkali Creek Feedground for supplemental feeding until 2028. (Id. ¶¶ 59-60.)
C. Procedural History
Plaintiffs are various environmental organizations that are headquartered in Idaho, California, Wyoming, and Montana. (See Compl. ¶¶ 8-12; Pls.' Opp'n at 24 n.3.) Plaintiffs filed the instant complaint on June 5, 2017, challenging the Forest Service's "approval of the Wyoming Game and Fish Commission's ... request to amend a special use permit to include Alkali Creek Feedground[.]" (Compl. ¶ 1.)
Plaintiffs' complaint contains two counts. In Count One, Plaintiffs generally allege that, in refusing to give adequate consideration to phasing out elk supplemental feeding programs entirely, the Forest Service "violated its obligations under NEPA to 'study, develop, and describe appropriate alternatives to recommended courses of action[.]" (Id. ¶ 64 (quoting 42 U.S.C. § 4332(E) ).)[5] In Count Two, Plaintiffs cast as a violation of the APA this same allegedly arbitrary "fail[ure] to articulate a reasoned explanation for [the Forest Service's] decision to permit artificial feeding on federal grounds for the foreseeable future in light of the [National Park Service] and the [Fish and Wildlife Service's] 2007 decision to phase out artificial feeding [on the National Elk Refuge]." (Id. ¶ 70.) Plaintiffs also maintain that the Forest Service violated the APA by "ignor[ing] its own statutory management obligations" for National Forest Service lands and "rel[ying] on factors that Congress did not intend for it to consider[,]" because the special-use permit impermissibly "defer[s] the decision regarding Alkali Creek Feedground and management goals for the Jackson herd to the WGFC[.]" (Id. ¶ 71.) As relief for these alleged violations, Plaintiffs seek a declaration and an injunction that stops the operation of the Alkali Creek Feedground, sets aside the Forest Service's Final Supplemental EIS, ROD, and special-use permit, and compels Defendants to prepare and issue annual reports examining the management practices of feedgrounds on the Bridger-Teton National Forest. (See id. , Prayer for Relief, ¶¶ 1-4.)
The government Defendants seek transfer of the instant action to the District of Wyoming under 28 U.S.C § 1404(a). (See Defs.' Mot.) In the transfer motion, the government argues that, because the events that form the basis of the lawsuit all occurred in Wyoming, there is "strong local interest in this dispute," such that the interests of justice are better served by transferring the case to Wyoming. (Id. at 5.) Plaintiffs oppose the transfer request, asserting that their choice of forum deserves deference. (See Pls.' Opp'n at 6.) Moreover, Plaintiffs contend that this case should be resolved in the District of the District of Columbia, in particular, because of the "highly pertinent rulings" in this District that purportedly bear on the issues in this case (id. ), and because the case involves "issues of national significance and interest, which is consistent with litigating *356 these matters in the District of Columbia" (id. at 7).
II. LEGAL STANDARD FOR MOTIONS TO TRANSFER UNDER SECTION 1404
Section 1404 of Title 28 of the United States Code provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C § 1404(a). The Supreme Court has held that this venue-transfer provision "accords broad discretion to the district court," but it has also made clear that the district court's discretion should be informed by a number of factors borrowed from the doctrine of forum non conveniens. Stewart Org., Inc. v. Ricoh Corp. , 487 U.S. 22, 31, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988).
As a threshold matter, the district court must ask whether the lawsuit "might have been brought" in the forum where the defendant seeks to transfer the case in the first instance. In re Scott , 709 F.2d 717, 720 (D.C. Cir. 1983). If this threshold inquiry is satisfied, the court then decides whether the transfer would be in the interest of convenience and justice, see 28 U.S.C § 1404(a) -taking into account both private interest factors that pertain to the effect of a transfer on those concerned with the specific dispute in question and public interest factors that relate to judicial economy and systemic fairness. See Stewart Org., Inc. , 487 U.S. at 30, 108 S.Ct. 2239 ; cf. Gulf Oil Corp. v. Gilbert , 330 U.S. 501, 508-09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).
The private interest factors are "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to the sources of proof." United States v. H & R Block, Inc. , 789 F.Supp.2d 74, 78 (D.D.C. 2011). These factors examine the particular dispute at issue to weigh "the parties' private expression of their venue preferences" as well as "the convenience of witnesses." Stewart Org., Inc. , 487 U.S. at 30, 108 S.Ct. 2239. By contrast, the public interest factors capture concerns of "systemic integrity and fairness[,]" id. ; they are "(1) the local interest in making local decisions regarding local controversies; (2) the relative congestion of the transferee and transferor courts; and (3) the potential transferee court's familiarity with the governing law[,]" H & R Block, Inc. , 789 F.Supp.2d at 78.
Ultimately, transfer analysis is an "individualized, case-by-case consideration of convenience and fairness." Van Dusen v. Barrack , 376 U.S. 612, 622, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). When making such an evaluation, "a court may consider undisputed facts outside the pleadings[,]" similar to the evaluation of a motion to dismiss for improper venue. Cooper v. Farmers New Century Ins. Co. , 593 F.Supp.2d 14, 18 (D.D.C. 2008). The defendant-i.e., the movant-bears the burden of justifying a transfer. See H & R Block, Inc. , 789 F.Supp.2d at 78.
III. ANALYSIS
A. The Instant Case Could Have Been Brought In The District Of Wyoming
Civil actions against an officer or employee of the United States, or an agency of the United States, may "be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the *357 subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e). Because the instant dispute concerns a land-use permit in Wyoming, the District of Wyoming is where a "substantial part of [the] property that is the subject of the action is situated[.]" Id. Furthermore, Plaintiffs are challenging a Forest Service determination that Wyoming-based agency personnel-i.e., the Forest Supervisor of the Bridger-Teton National Forest-made in Wyoming. (See Final ROD at 1-3.) Therefore, it is clear that "a substantial part of the events or omissions giving rise to the claim" also occurred in that District. 28 U.S.C. § 1391(e).
Indeed, Plaintiffs here do not dispute that the lawsuit could have properly been brought in either this District or the District of Wyoming (see Pls.' Opp'n at 22), and nor could they, as it is well established that, when the dispute concerns land in the local district, venue is proper in the local jurisdiction even for cases involving a federal question if the local office of the federal agency was involved in the challenged decision and the agency decision making process occurred in the local jurisdiction. See S. Utah Wilderness All. v. Norton ("SUWA I") , 315 F.Supp.2d 82, 86 (D.D.C. 2004). There is no question that such is the case here.
B. The Private Interest Factors Support Transfer Because The Locus Of This Dispute Is In Wyoming
Turning to the private interest factors, which examine the controversy at issue to assess the locus of the dispute and the overall convenience of the fora, as explained above, this Court has little doubt that the locus of the instant controversy lies in Wyoming, and that its connection to the District of Columbia is "tenuous at best." M & N Plastics, Inc. v. Sebelius , 997 F.Supp.2d 19, 26 (D.D.C. 2013). Accordingly, the usual deference to Plaintiffs' preference for litigating in the District of Columbia is not warranted, and transfer to Wyoming is appropriate.
1. Plaintiffs' Choice Of Forum Does Not Outweigh The Interest In Adjudicating This Matter In Wyoming, Where Plaintiffs' Claims Arose
Courts ordinarily give significant deference to the plaintiff's choice of forum, such that the defendant must overcome "a strong presumption in favor of the chosen forum." Oceana, Inc. v. Pritzker , 58 F.Supp.3d 2, 5 (D.D.C. 2013) (internal quotation marks and citation omitted). But it is also well established that "deference to the plaintiff's chosen forum is minimized ... where that forum has no meaningful connection to the controversy," H & R Block, Inc. , 789 F.Supp.2d at 79, and where the transferee forum "has substantial ties to both the plaintiff and the subject matter of the lawsuit[,]" Douglas v. Chariots for Hire , 918 F.Supp.2d 24, 31-32 (D.D.C. 2013) (internal quotation marks and citation omitted). See also Schmidt v. Am. Inst. of Physics , 322 F.Supp.2d 28, 33 (D.D.C. 2004) (noting that "deference is mitigated" when choice of forum has "no meaningful ties to the controversy and no particular interest in the parties or subject matter" (internal quotation marks and citation omitted) ); Lab. Corp. of Am. Holdings v. NLRB , 942 F.Supp.2d 1, 4 (D.D.C. 2013) ("[W]here there is an insubstantial factual nexus between the case and the plaintiff's chosen forum, deference to the plaintiff's choice of forum is ... weakened" (alteration in original) (internal quotation marks and citations omitted).).
Here, the matter in dispute-the federal government's decision to authorize the state of Wyoming to use national forest lands for a state-sponsored supplemental elk feeding program-is clearly centered *358 in Wyoming, and its tie to the District of Columbia is not immediately apparent. See Wildearth Guardians v. U.S. Bureau of Land Mgmt. , 922 F.Supp.2d 51, 54, 56 (D.D.C. 2013) (finding no meaningful ties to the District of Columbia where the "central dispute concern[ed] land located in Wyoming and [arose] out of acts by [the agency] in that district" and transferring the case). To be sure, the Chief of the U.S. Forest Service and the Secretary of Agriculture (who are the named Defendants in this case) and their agencies "are resident in, and headquartered in" the District of Columbia (Pls.' Opp'n at 6), but in the absence of any allegation that the challenged decision was made with the involvement of any D.C.-based Forest Service officials, the fact that these named defendants reside in the District of Columbia is insufficient to support a meaningful nexus to the District. See Sierra Club v. Flowers , 276 F.Supp.2d 62, 65 (D.D.C. 2003) (explaining that, "[i]n this circuit, courts must examine challenges to venue particularly carefully"; otherwise, merely "[b]y naming high government officials as defendants, a plaintiff could bring a suit here that properly should be pursued elsewhere" (internal quotation marks and citation omitted) ); see also Pres. Soc'y of Charleston v. U.S. Army Corps of Eng'rs , 893 F.Supp.2d 49, 55 (D.D.C. 2012) ("[T]he mere fact that a case concerns the application of a federal statute by a federal agency does not provide a sufficient nexus to the District of Columbia to weigh against transfer" (citations omitted).).
Nor is it sufficient that Defendants Tidwell and Perdue are "directly responsible for the supervision" of the National Forest System, and "ultimately responsible for overseeing the work of the [Forest Service,]" as Plaintiffs emphasize. (Compl. ¶¶ 15-16). See W. Watersheds Project v. Pool , 942 F.Supp.2d 93, 99 (D.D.C. 2013) (finding that the role of high-level agency officials in "ultimately oversee[ing] all agency activities" does not, alone, "favor venue in the District of Columbia" (citation omitted) ). There is no evidence in the instant record that the named Defendants participated in making the challenged decision regarding the Alkali Creek Feedground (see Final ROD at 1-3); that is, the record fails to indicate that these Defendants played any role, let alone an "active or significant role[,]" Airport Working Group v. Dep't of Defense , 226 F.Supp.2d 227, 230 (D.D.C. 2002), in the challenged decision. See S. Utah Wilderness All. v. Lewis ("SUWA II") , 845 F.Supp.2d 231, 235 (D.D.C. 2012) (noting that minor "involvement on the part of federal agencies, or some federal officials who are located in Washington ... is not determinative" of the venue question (internal quotation marks and citations omitted) ).
Plaintiffs further maintain that they have chosen the District of Columbia as the forum for the instant case because "there is already an established body of relevant precedent for consideration of Plaintiffs' claim" here (Pls.' Opp'n at 23), and to support this contention, Plaintiffs point to the three prior cases in this District that have involved the Jackson elk herd (id. at 8-15). It is true that judges in this jurisdiction have adjudicated the merits of similar challenges, but Plaintiffs' emphasis on what it views as "relevant precedent" ignores the relevant inquiry, which is whether the plaintiff's choice of forum has a "meaningful connection to th[is] controversy ," H & R Block, Inc. , 789 F.Supp.2d at 79 (emphasis added), such that there is a significant "factual nexus between the case and the plaintiff's chosen forum," Lab. Corp. , 942 F.Supp.2d at 4 (internal quotation marks and citations omitted) (emphasis added). When addressing that question, a court must consider the facts and circumstances of the case at *359 bar and determine whether such facts and circumstances actually pertain to the chosen forum, and Plaintiffs fail to explain how consideration of the presence or absence of similar, prior cases in the forum (i.e., that jurisdiction's precedents) has any bearing on that analytical framework.
Thus, this appears to be a case in which "[d]eference to the plaintiff's chosen forum is minimized" because the chosen forum "has no meaningful connection to the controversy[.]" H & R Block, Inc. , 789 F.Supp.2d at 79. And any remaining deference to Plaintiffs' forum choice is even further reduced, because "the subject matter" of the lawsuit clearly arose in a forum other than the one that Plaintiffs have chosen. Douglas , 918 F.Supp.2d at 32 (internal quotation marks and citation omitted). In APA cases that involve challenges to agency decision making, "courts generally focus on where the decisionmaking process occurred to determine where the claims arose." Nat'l Ass'n of Home Builders v. EPA , 675 F.Supp.2d 173, 179 (D.D.C. 2009). It is evident on the record here that Forest Service officials in Wyoming were the relevant decision makers in authorizing the use of the Alkali Creek Feedground (see ROD at 1-3; Defs.' Mot. at 8); thus, the agency decision-making processes and analyses that led to the challenged permit occurred in Wyoming. What is more, the land for which the special-use permit was issued is also located in Wyoming (see Compl. ¶¶ 1-2), and the authorized supplemental feeding activities are conducted by a Wyoming state agency (see id. ¶ 1.) Plaintiffs also cannot deny that the alleged harm from the issuance of the challenged permit is felt most directly in Wyoming, given their representation that "an outbreak of lethal chronic wasting disease" could spread among the elk (id. ¶ 2), causing damage to the Jackson elk herd and the surrounding environment (see id. ¶¶ 2-3; see also Defs.' Mot. at 8). See Trout Unlimited v. U.S. Dep't of Agriculture , 944 F.Supp. 13, 17 (D.D.C. 1996) (transferring case to Colorado because of "the impact that the resolution of this action will have upon the affected lands, waters, wildlife and people of that state").[6]
Thus, while Plaintiffs' legal action has few (if any) connections to the instant jurisdiction, H & R Block, Inc. , 789 F.Supp.2d at 79, it clearly has "substantial ties" to a forum that is different than the one that they have chosen, Douglas , 918 F.Supp.2d at 32 (internal quotation marks and citation omitted). Consequently, in this Court's view, the first three private interest factors-the plaintiff's choice of forum, the defendant's choice of forum, and where the claim arose-weigh in favor of transfer, and Plaintiffs' argument that Defendants' motion to transfer should be denied because Plaintiffs' decision to file the instant action in the District of Columbia is entitled to deference is unpersuasive. See, e.g. , Pres. Soc'y , 893 F.Supp.2d at 54-56 (concluding that transfer to South Carolina is warranted where the claim has no meaningful nexus with the District of Columbia, the challenged project was located in South Carolina and its effects would be felt there, and the relevant decision makers were located in South Carolina);
*360 Trout Unlimited , 944 F.Supp. at 17-18 (concluding that transfer to Colorado is warranted where the District of Columbia had no meaningful ties, Colorado possessed a strong interest because of the dispute's effect on local lands and wildlife, and the challenged agency decision was made by the regional office located in Colorado).
2. The Convenience Factors Are Generally Inapposite, Because The Instant Case Is Likely To Be Resolved Based On The Administrative Record
Administrative review cases "are often resolved on cross-motions for summary judgment[.]" Pac. Ranger, LLC v. Pritzker , 211 F.Supp.3d 196, 209 (D.D.C. 2016). As a result, in such cases, courts typically decide the issues presented on the papers and the administrative record, and "the convenience factors carry little weight in the transfer analysis." M & N Plastics, Inc. , 997 F.Supp.2d at 25. Put another way, given the primary importance of the administrative record in cases such as this one, factors such as the convenience of the witnesses or the ease of access to sources of proof typically do not sway the transfer inquiry in either direction. Bergmann v. U.S. Dep't of Transp. , 710 F.Supp.2d 65, 74 (D.D.C. 2010) (holding that the convenience of the witnesses and the ease of access to sources of proof are not relevant factors where the case involves review of an administrative record and a trial is unnecessary).
The parties here agree that the instant dispute will be resolved based on the administrative record. (See Defs.' Mot. at 15-16; Pls.' Opp'n at 16.) Nevertheless, Plaintiffs insist that the convenience of the parties weighs against transfer, because counsel for both Plaintiffs and Defendants are located in Washington, D.C. (Pls.' Opp'n at 24.) Defendants respond that any inconvenience to the parties' lawyers is of minor concern (see Defs.' Reply at 12), and this Court agrees. In this modern age, courts in this district have routinely held that "[t]he fact that plaintiffs' counsel is in the District of Columbia is of little significance" in the transfer analysis. Kazenercom TOO v. Turan Petroleum, Inc. , 590 F.Supp.2d 153, 163 (D.D.C. 2008) (citing Reiffin v. Microsoft Corp. , 104 F.Supp.2d 48, 52 n.7 (D.D.C. 2000) ); see also Vencor Nursing Ctrs. v. Shalala , 63 F.Supp.2d 1, 6 n.4 (D.D.C. 1999). Plaintiffs cannot seriously maintain that D.C.-based lawyers will be hamstrung in their ability to make summary judgment arguments to a court seated in Wyoming.
Moreover and in any event, neither of the other convenience factors aimed at the potential inconvenience to witnesses and the parties' potential difficulty in gathering sources of proof are at issue here. See SUWA I , 315 F.Supp.2d at 88 (finding that, in an administrative challenge where witnesses will not be presented and it would not be difficult to transport the administrative record to any forum, the convenience factors pertaining to the convenience of the witnesses and the ease of access to sources of proof carry little weight). Thus, nothing about the private-interest convenience considerations moves this Court toward, or away from, the requested transfer.
C. The Public Interest Factors Support Transfer Due To The Localized Nature Of This Controversy
The assessment of whether the controversy is, in its essence, a local dispute is "the most important of the public interest factors[.]" SUWA II , 845 F.Supp.2d at 237. Notably, the interest in deciding local issues at home "applies to controversies involving federal decisions that impact the local environment, and [also] to controversies requiring judicial review of an administrative decision."
*361 Flowers , 276 F.Supp.2d at 70. As explained below, this Court has concluded that the instant dispute is a "localized" one, as opposed to being one of national significance, because its land and wildlife management issues most directly affect the government and citizens of the state of Wyoming, and because the challenged Forest Service decision-which pertains to the use of one specific feeding site, rather than a broad policy or program with far-reaching effects-is limited in scope. Accordingly, the interests of justice are best served by transferring this matter to the District of Wyoming, which appears fully capable of adjudicating this matter fairly and efficiently. See Nat'l Wildlife Fed'n v. Harvey , 437 F.Supp.2d 42, 50 (D.D.C. 2006) ("[T]he interests of justice are promoted when a localized controversy is resolved in the region that it impacts[.]"); see also H & R Block, Inc. , 789 F.Supp.2d at 78 (stating that public interest considerations include evaluating "the relative congestion of the transferee and transferor courts" and "the potential transferee court's familiarity with the governing law").
1. This Dispute Is A Localized Controversy That Can Be And Should Be Decided In Wyoming
The D.C. Circuit has held that "[t]here is a local interest in having localized controversies decided at home." Adams v. Bell , 711 F.2d 161, 167 (D.C. Cir. 1983). Disputes regarding permits and land-use issues are generally recognized to be a "localized interest." SUWA I , 315 F.Supp.2d at 88 ("Land is a localized interest because its management directly touches local citizens."); see also SUWA II , 845 F.Supp.2d at 237-38 ("The fact that this controversy will affect the use of discrete parcels of land counsels towards transfer to the judicial district where that land is located."); Intrepid Potash-New Mexico, LLC , 669 F.Supp.2d at 99 ("[L]and commonly has been considered a local interest."). Thus, courts in this District have routinely found it appropriate to transfer cases involving land and local wildlife to the local forum. See, e.g. , Trout Unlimited , 944 F.Supp. at 19-20 (finding that a lawsuit that involved issues of environmental regulation and local wildlife should be resolved in the local forum); see also Nat'l Wildlife Fed'n , 437 F.Supp.2d at 49-50 (finding that Florida and its people had a strong local interest in the management of the Everglades such that transfer was warranted).
The instant dispute is plainly of a piece with such prior cases. The challenged federal agency action is the issuance of a special-use authorization permit that allows the state of Wyoming to conduct supplemental feeding of elk at a particular site in northwest Wyoming, and the central issue is the management of local land and local wildlife, because if the addition of the site for supplemental feeding changes the behavior of the free-ranging elk, Wyoming and its people, and their property, are most directly affected by the disposition of this case. (See Compl. ¶ 31; Final ROD at 2 (describing the large-scale winter die-offs and damage to stored crops that initially motivated supplemental feeding, and the strategic placement of feeding sites to accommodate those interests).) See also Nat'l Wildlife Fed'n , 437 F.Supp.2d at 49-50 (transferring case to Florida where management of the local lands "directly affects the citizens of Florida[,]" despite the national significance of the Everglades and the national interest in the snail kite species as an endangered species).
The fact that the instant dispute is ultimately about the authorized use of one particular feeding site in Wyoming further undermines Plaintiffs' suggestion that the instant matter has national implications. See SUWA I , 315 F.Supp.2d at 88 (granting *362 transfer where, "[n]otwithstanding ... national attention, the dispute remains focused on 21 parcels of land in Utah"). Despite the complaint's grandiose contentions regarding the well-being of the Jackson elk herd and the deleterious effects of supplemental feeding, Plaintiffs' claims and requested relief are truly aimed only at the Forest Service's decision to authorize the WGFC's use of the Alkali Creek Feedground, not at any broader policy. (See Compl. ¶¶ 63-71; id. , Prayer for Relief ¶¶ 1-4.)
To be sure, Plaintiffs vigorously maintain otherwise; indeed, they have struggled valiantly to style their lawsuit as a broad challenge to nefarious government-wide policies pertaining to supplemental elk feeding writ large. For example, Plaintiffs' complaint expressly links the instant permit challenge to a beleaguered federal feeding program that the Fish and Wildlife Service and the National Park Service adopted in 2007-"the Bison and Elk Management Plan"-by asserting that the special-use permit the Forest Service issued here "is even more arbitrary when considered in conjunction with the National Park Service [ ] and the Fish and Wildlife Service's [ ] joint decision to phase out [the] artificial feeding on the [National Elk Refuge]" as contemplated by those agencies' Bison and Elk Management Plan. (Compl. ¶ 5.) See also Defs. of Wildlife , 651 F.3d at 113.
Though admirable in their creativity, Plaintiffs do not (and cannot) answer why the Forest Service's actions here should be "considered in conjunction" with what the Fish and Wildlife Service and the National Park Service did in 2007. After all, the Bison and Elk Management Plan is entirely distinct from the dispute in this case. The federal agencies involved with that program are completely different than the one at issue here, and that supplemental feeding policy concerned the National Elk Refuge and the Grand Teton National Park, not the Bridger-Teton National Forest. Moreover, even if the federal government's stance on supplemental feeding as articulated by the Fish and Wildlife Service and the National Park Service somehow implicates the claims at issue here, that, by itself, does not elevate Plaintiffs' challenge of a particular, local application of that wider policy (i.e., the complaint's administrative challenge to the procedures that the local office followed in the context of that application) into an issue of national proportions. See, e.g. , SUWA I , 315 F.Supp.2d at 87 (transferring case where "the actual lease decisions ... in dispute" were made by the local office, even though a broader agency-wide wilderness policy was implicated in that decision). In other words, there is no national policy or agency-wide plan at stake here, and no amount of careful crafting can transform a local permit challenge into a matter of national concern.
Plaintiffs' only other argument that the instant case is national in character appears to rely primarily on the fact that courts in this District have previously adjudicated disputes that touched upon on the Jackson elk herd-a fact that, Plaintiffs say, essentially constitutes res ipsa support for their contention that "the well-being of the Jackson elk herd ... [is a] matter[ ] of national importance and concern[.]" (Pls.' Opp'n at 26.) No one can deny that there are several published cases from this jurisdiction that pertain to policies involving the Jackson elk herd, see, e.g. , Mayo v. Jarvis , 177 F.Supp.3d 91 (D.D.C. 2016), aff'd sub nom. Mayo v. Reynolds , 875 F.3d 11 (D.C. Cir. 2017) ; Defs. of Wildlife v. Salazar , 698 F.Supp.2d 141 (D.D.C. 2010), aff'd , 651 F.3d 112 (D.C. Cir. 2011) ; Fund for Animals v. Clark , 27 F.Supp.2d 8 (D.D.C. 1998), but this alone tells us nothing about whether the related *363 courts viewed the cases before them to be national in scope.[7] Moreover, Plaintiffs acknowledge that the government did not seek to have any of the prior Jackson elk herd cases transferred to Wyoming. (See Pls.' Opp'n at 10, 13, 15.) Plaintiffs argue that this must mean that the government had no grounds to request such a transfer (see id. at 8), and thus this Court should find that the government has no grounds to request a transfer now, but given the "factually analytical, case-by-case determination" that a motion to transfer involves, SEC v. Savoy Indus., Inc. , 587 F.2d 1149, 1154 (D.C. Cir. 1978), any such inference is unfounded. Whatever the reasons might have been for the government's decision to forgo seeking a transfer in those prior cases, the only reasonable conclusion that can be drawn now is that none of the prior courts actually reached or resolved the question of whether litigation involving the Jackson elk herd is necessarily national in scope.
To be clear: this Court by no means intends to suggest that the opinions from other judges in this District that treat the Jackson elk as "iconic" and that wax eloquently about the "considerable ecological, economic, and cultural value" of this species (see Pls.' Opp'n at 26 (internal quotation marks and citations omitted) ) have it wrong, or that they have disingenuously inserted themselves into matters that were plainly local in character and were best left to Wyoming's courts. Indeed, notably, prior cases involved federal programs, giving them a "national" aura that is plainly absent here. See Mayo , 177 F.Supp.3d at 104 (challenging "the NPS's and the FWS's actions in managing the annual elk reduction program"); Defs. of Wildlife , 698 F.Supp.2d at 145-146 (challenging the NPS's and the FWS's "comprehensive Bison and Elk Management Plan" for failing to assign a definite end date to the federal supplemental feeding program on the National Elk Refuge); Fund for Animals , 27 F.Supp.2d at 10 (challenging "the proposed plan of the federal government to reduce the size of a herd of American bison"). All this Court is saying is that none of these prior cases actually evaluates the significance of the Jackson elk herd in the context of determining the appropriate venue , and all of them involved challenges to a federal-agency decision, which makes them of little utility for this Court's present task of deciding whether the interests of justice are better served by transferring the instant elk-related challenge to a one-off federal-agency permit that approves state-directed feeding activity.
All things considered, then, the 'localized controversy' public interest factor weighs in favor of transfer, because a transfer to the District of Wyoming recognizes the strong local interest in land and wildlife management and the particularized nature of the instant dispute over the WGFC's use of one particular feeding site in northwestern Wyoming, and thereby promotes the interests of justice.
2. The Relative Congestion Of The Courts And The Courts' Relative Familiarity With The Governing Law Factors Are Neutral
The remaining public interest factors, which pertain to judicial economy, do not weigh heavily in favor of either forum. In regard to congestion, Defendants note that there are fewer cases pending in the District of Wyoming than in this District, but they also acknowledge that this District generally resolves civil cases more quickly on average. (See Defs.' Mot. at 12.) Plaintiffs contend that the faster resolution of *364 cases in the District of Columbia District disfavors transfer (see Pls.' Opp'n at 25); however, taking these metrics together, court-congestion considerations do not push strongly in either direction. See, e.g. , Gulf Restoration Network v. Jewell , 87 F.Supp.3d 303, 315 (D.D.C. 2015) ("Absent a showing that the docket of either court is substantially more congested than the other, this factor is neutral" (internal quotation marks and citation omitted).).
The factor concerning the courts' relative familiarity with the governing law is also neutral. The District of the District of Columbia is often called upon to apply federal statutes and regulations to particular agency decisions, but it is well settled that any "federal court is competent to decide federal issues correctly[.]" In re Korean Air Lines Disaster of Sept. 1, 1983 , 829 F.2d 1171, 1175 (D.C. Cir. 1987). Thus, Plaintiffs' observation that the instant forum "regularly resolves administrative record cases involving challenges under the National Environmental Policy Act ... and the Administrative Procedure Act" (Pls.' Opp'n at 7) is not an especially weighty consideration.
Furthermore, with respect to core competencies, Plaintiffs cannot credibly contend that the District of Wyoming is ill-equipped to handle a case of this nature. While the instant forum does have prior cases in which "extensive factual and legal findings concerning the federal government's management of the Jackson elk herd" were made (Pls.' Opp'n at 7-8), the three cases that have been decided in this District involving the elk herd over the past two decades have all involved different federal agencies, different actions, and/or different lands than the instant dispute, and indeed, neither Fund for Animals nor Mayo involved a direct challenge to an elk feeding program. See Mayo , 177 F.Supp.3d at 104 (reviewing a challenge to a federal elk hunting program); Fund for Animals , 27 F.Supp.2d at 14 (reviewing a challenge to a federal bison hunt in the context of a preliminary injunction, and finding that agencies had to consider the impact of the elk and bison feeding programs when managing the bison). Thus, it is not at all clear why Plaintiffs suggest that this Court's consideration of the instant (dissimilar) facts and issues would ensure "judicial efficiency[,]" "economy[,]" and consistency. (Pls.' Opp'n at 8.) Quite to the contrary, a rudimentary Westlaw search reveals that myriad environmental challenges involving wildlife species within the state of Wyoming have been brought and fully adjudicated in the District of Wyoming, including challenges involving elk and bison. See, e.g. , Ketcham v. Nat'l Park Serv. , Civ. No. 16-00017, 2016 WL 4269037, at *1 (D. Wyo. Feb. 5, 2016) (reviewing a challenge to the National Park Service's bison culling activities on federal lands); Parker Land & Cattle Co. v. United States , 796 F.Supp. 477, 486 (D. Wyo. 1992) (reviewing the Fish and Wildlife Service and National Park Service's management of brucellosis among elk and bison on federal lands). Thus, far from leading inexorably to the denial of a request to transfer such a matter to the District of Wyoming, Plaintiffs' stated concern about the risk of inconsistent rulings counsels in favor of sending this matter to Wyoming's federal courts-or at least strongly suggests that federal courts outside of Wyoming should more routinely defer to that district's obvious familiarity with the governing law.
IV. ORDER
As explained above, this Court has fully reviewed the parties' submissions, and has considered (and weighed) the relevant legal factors. On balance, the Court finds that the locus of the instant permit dispute is in the state of Wyoming, that there are *365 no significant ties between the instant dispute and the District of Columbia, and that transferring the instant case to the District of Wyoming will promote the interests of justice, because it will allow a dispute that has strong ties to Wyoming to be adjudicated in the local forum. Thus, this Court will exercise its discretion to transfer this case. Accordingly, it is hereby
ORDERED that Defendants' motion to transfer venue (ECF No. 8) is GRANTED . Pursuant to this Order, the Clerk is instructed to TRANSFER the above-entitled action to the U.S. District Court for the District of Wyoming.

Because Chief Tidwell and Secretary Perdue are being "sued in [their] official capacit[ies] only" (Compl. ¶¶ 15-16), this suit functions as an action against the EPA, see Cty. Bd. of Arlington v. U.S. Dep't of Transp. , 705 F.Supp.2d 25, 28 (D.D.C. 2010) ("[A]n official-capacity suit is a way of pleading an action against the agency which the official heads."), and will be treated as such for purposes of this Memorandum Opinion and Order.

Citations to the documents the parties have filed refer to the page numbers that the Court's electronic filing system assigns.

The same herd of elk that is at issue in the instant case was featured in the prior cases, to varying degrees. See Mayo v. Jarvis , 177 F.Supp.3d 91 (D.D.C. 2016), aff'd sub nom. Mayo v. Reynolds , 875 F.3d 11 (D.C. Cir. 2017) ; Defenders of Wildlife v. Salazar , 698 F.Supp.2d 141 (D.D.C. 2010), aff'd , 651 F.3d 112 (D.C. Cir. 2011) ; Fund for Animals v. Clark , 27 F.Supp.2d 8 (D.D.C. 1998). This herd of animals is referred to as the "Jackson elk herd" because it is based in and around Jackson Hole, Wyoming. See Mayo , 177 F.Supp.3d at 99-100.

The WGFC is the state entity that functions as "the policy making board of the Wyoming Game and Fish Department." (Final ROD at 1.)

Specifically, Plaintiffs maintain that the Forest Service failed to solicit public comments on "substantial changes to the statement of purpose and need made in the Erratum to the [final supplemental EIS]" (Compl. ¶ 65); failed to take a "legally mandated 'hard look' " at the adverse impacts of its decision, including the spread of chronic wasting disease among the elk (id. ¶ 66); failed to account for the Fish and Wildlife Service and National Park Service's decision to phase out supplemental feeding in the nearby National Elk Refuge (see id. ¶ 67); failed to evaluate the cumulative impact of its decision (see id. ¶ 68); and failed to prepare "an annual report reviewing the management practices of feedgrounds" in the Bridger-Teton National Forest as set out in the Final ROD (id. ¶ 69).

Defendants also point out that "the members that Plaintiffs rely upon for standing regularly visit the Bridger-Teton National Forest" in Wyoming. (Defs.' Mot. at 14; see also Compl. ¶ 13.) This is, in essence, a claim that the injury Plaintiffs allege would occur in Wyoming, which may or may not be the case, given the allegations in Plaintiffs' complaint (see Compl. ¶¶ 13-14 (asserting that the supplemental feeding program will injure the Greater Yellowstone Ecosystem, which spans several neighboring states in addition to Wyoming) ). Nevertheless, it is clear to this Court that Wyoming is a site of the alleged harm in a way that the District of Columbia is not.

Federal courts with jurisdiction resolve the cases that are brought to them, and do not gratuitously evaluate the nature of the matter (localized or national) as a threshold concern.